# Exhibit G

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF ILLINOIS

2                     EASTERN DIVISION

3   RUFUS LOVELL BROOKS,              )

                                      )

4              Plaintiff,             )   Case No: 18-cv-03472

                                      )

5        v.                           )

                                      )

6   SAC WIRELESS, LLC,                )

                                      )

7              Defendant.             )

8

9              The deposition of JEFF HAMM, called for

10  examination, taken pursuant to notice and pursuant to

11  the Federal Rules of Civil Procedure of the United

12  States District Courts, taken before Annette Brewer,

13  Certified Shorthand Reporter, in and for the County

14  of Cook and State of Illinois, on February 21, 2019,

15  at 2:15 p.m., at 55 E. Monroe Street, Chicago,

16  Illinois.

17

18

19

20

21

22

23

24

Page 2

```
 1  PRESENT:
 2
 3  BY: RUFUS LOVELL BROOKS; Acting pro se
    14016 Myrtlewood Drive
 4  Orlando, Florida 32832
    (407) 704-8123
 5  brooks.rufus@yahoo.com
 6
    THOMPSON COBURN FAGEL HABER
 7  BY: MS. SUSAN LORENC
    55 East Monroe Street, 37th Floor
 8  Chicago, Illinois 60603
    (312) 580-2344
 9  slorenc@thompsoncoburn.com
        Appeared on behalf of Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          I N D E X
    Witness:                  Page
 2  JEFF HAMM
 3  EXAMINATION                6
    BY MR. BROOKS
 4
 5          EXHIBITS
 6  Exhibit Nos.              Page
 7
    Exhibit No. A  Typed written document   92
 8
    (Exhibit attached)
 9
10
    QUESTION(S) CERTIFIED
11      Page    Line
12      40      11
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          (WHEREUPON, the witness was duly
 2          sworn.)
 3      MR. BROOKS:  You have to identify yourself
 4  for the record.
 5      MR. SHORETTE:  Jacob Shorette, SAC Wireless,
 6  party representative.
 7      MS. LORENC:  Susan Lorenc, attorney for
 8  defendant SAC Wireless.
 9      MR. HAMM:  Jeff Hamm, director of
10  Environmental, Health & Safety for SAC Wireless.
11      MR. BROOKS:  Rufus Brooks, plaintiff.
12      MS. LORENC:  Mr. Brooks, before we get
13  started, I would like the record to reflect that it's
14  2:15 p.m.  Central time.  This is the deposition of
15  Jeff Hamm that was noticed for 12:00 p.m. Central
16  time.
17          You arrived at 1:32 this afternoon
18  without any explanation as to the delay.  And we are
19  accommodating your delay and allowing Mr. Hamm to
20  proceed two hours and 15 minutes after the noticed
21  time.
22          I'd also like the record to reflect
23  that you have your own video camera trained on
24  Mr. Hamm.  I do note that you indicated in your
```

Page 5

```
 1  notice of deposition that you would be taking the
 2  deposition by stenographic video and other means.
 3  However, you are not a licensed court reporter or a
 4  videographer as far as I know and this is not a court
 5  reporter-based video camera.  So we may -- we
 6  preserve our right to object to the video taping of
 7  this deposition and in an improper manner.
 8      MR. BROOKS:  Your opposition to the videotape
 9  is noted over all.  I am sure the judge will probably
10  tell you, if any lawyer will tell you.  As to the
11  delay, let the record reflect that a call was made to
12  counsel office and to Mr. Ryan, which is the counsel
13  of record, that the client -- I mean proper notice
14  was given and I was going to be late.
15          In terms of a reason and whatever,
16  that's personal.  But in case you want to have a
17  reasonable record, I have been traveling since 2:00
18  o'clock this morning and I am an old guy, 69 years
19  old, so I need some rest.  So I choose to take a
20  break so I could be fresh.  So when I take Mr. Hamm
21  deposition I would be patient and when you start
22  doing your little objection and stuff, I will be
23  patient.  It's important that I got some rest, okay?
24  I apologize to Mr. Hamm for being late.  I apologize
```

2 (Pages 2 - 5)

Page 6

1 to you and I apologize to you. I won't apologize to
2 you because I didn't know you was coming.
3          In addition to that, I called the
4 court reporter scheduler and I did let them know I
5 was running late. Okay. Anything else?
6     MS. LORENC: No. Feel free to proceed.
7     MR. BROOKS: Also let the record reflect this
8 is -- the deposition is being taken by the plaintiff
9 and the plaintiff is in charge of the deposition and
10 not the defendant attorney. I don't need to be given
11 notice of how or what or when to do something.
12     MS. LORENC: I have no idea to what you are
13 referring.
14     MR. BROOKS: In other words, don't tell me
15 when to start, stop or do anything. Okay? Treat me
16 like you treating another attorney. That's all.
17 That's it. Okay.
18          JEFF HAMM,
19 called as a witness herein, having been first duly
20 sworn, was examined and testified as follows:
21          EXAMINATION
22 BY MR. BROOKS:
23     Q. Mr. Hamm. Jeff Hamm; correct?
24     A. What's that?

Page 7

1     Q. You are Mr. Jeff Hamm; correct?
2     A. That is correct.
3     Q. Okay. You can't not your head. You have
4 to --
5     A. I understand.
6     Q. Have you had your deposition taken
7 before?
8     A. A few years back, yes.
9     Q. You realize that what you say in the
10 deposition is the same as you would say in a
11 courtroom under oath?
12     A. I do understand that.
13     Q. Mr. Hamm, are you employed by SAC
14 Wireless?
15     A. Yes.
16     Q. In what position?
17     A. Director of Environmental, Health &
18 Safety.
19     Q. What is that? Could you describe that
20 position?
21     A. I manage the environmental, health and
22 safety aspects of the business from a risk
23 perspective in assisting our employees of going home
24 safe every day.

Page 8

1     Q. How long have you been performing that
2 task?
3     A. For?
4     Q. SAC Wireless.
5     A. Since September 8, 2014.
6     Q. 2014? Prior to that who did you work
7 for?
8     A. Nokia.
9     Q. What was your position at Nokia?
10     A. Manager of safety. Environmental, Health
11 & Safety.
12     Q. Did you work for Nokia the corporation or
13 Nokia alone?
14     A. Nokia.
15     Q. Where were you based out of?
16     A. Atlanta, Georgia.
17     Q. Where is Nokia USA headquarters located?
18     MS. LORENC: Objection. Relevance.
19          You can answer.
20 BY MR. BROOKS:
21     Q. You still have to answer.
22     A. Irving, Texas, 6000 Connection Drive.
23     Q. Irving, Texas. Did you report directly
24 to the corporate office?

Page 9

1     A. Yes, sir.
2     Q. How long did you work for Nokia?
3     A. Five months.
4     Q. On what date did you start Nokia?
5     A. April 8, 2014.
6     Q. 2014?
7     A. Yes, sir.
8     Q. When did you stop?
9     A. September 8, 2014.
10     Q. Were you terminated?
11     A. No.
12     Q. Why did you leave?
13     A. Nokia purchased SAC Wireless.
14     Q. So you were part of the purchase?
15     THE COURT REPORTER: I'm sorry, I didn't hear
16 you?
17     THE WITNESS: What's that?
18     THE COURT REPORTER: He nodded his head.
19     MS. LORENC: You have to give a verbal
20 response.
21     THE WITNESS: I thought I did. I'm sorry if
22 you didn't hear me.
23          I said Nokia purchased SAC Wireless.
24          Was there a question after that?

Page 10

1    MR. BROOKS: No.
2 BY MR. BROOKS:
3    Q. So prior to working for Nokia who did you
4 work for?
5    A. Bechtel group of companies.
6    Q. What division?
7    A. At which time?
8    Q. At any time.
9    A. All of them.
10    Q. When did you start with Bechtel
11 Corporation?
12    A. I am going to have to say 1989. It would
13 be -- it depends on the project that I was on. But
14 my first time with Bechtel Construction was summer of
15 '89 is when I started working with them.
16    Q. Were you an employee or contractor?
17    A. Employee. And contractor.
18    Q. What was your job title?
19    MS. LORENC: Objection. Form.
20       You can answer.
21 BY THE WITNESS:
22    A. When? What year?
23 BY MR. BROOKS:
24    Q. 1989 when you first started, what were

Page 11

1 you working as?
2    A. Electrician foreman.
3    Q. How long were you employed as electrician
4 foreman?
5    A. Until mid -- I want to say until mid
6 1990.
7    Q. Until mid 1990's. July, June? What
8 date?
9    A. I don't recall.
10    Q. When did you stop? You started 1989 but
11 you don't know which month, right?
12    A. I don't recall.
13    Q. And you stopped in 1989. But you don't
14 know what month?
15    A. I don't recall.
16    Q. Do you recall how long you worked for
17 them during this period?
18    MS. LORENC: I'm sorry, as to what?
19 BY MR. BROOKS:
20    Q. How long did you work for Bechtel during
21 this period, this window of 1989 to 19 --
22    A. My continuous service with Bechtel was 18
23 and a half years, I think.
24    Q. Between 1989 until you say you stopped in

Page 12

1 1998, right?
2    MS. LORENC: Objection. That misstates his
3 testimony.
4       Go ahead.
5 BY THE WITNESS:
6    A. 1990. Mid 1990.
7 BY MR. BROOKS:
8    Q. 1990. Okay. During that period you
9 worked what, eight months?
10    A. Yes.
11    Q. About eight months or so? Okay. Why did
12 you leave?
13    MS. LORENC: Objection. Misstates his
14 testimony.
15 BY MR. BROOKS:
16    Q. Were you terminated?
17    A. No, I was not.
18    Q. Were you laid off?
19    A. No.
20    Q. Quit?
21    A. No.
22    Q. You want to tell me why you only worked
23 there a short period of time?
24    MS. LORENC: Objection. Misstates his

Page 13

1 testimony. You asked him if he was an electrician.
2    MR. BROOKS: I understand that.
3 BY MR. BROOKS:
4    Q. I asked you was why did you leave. Were
5 you terminated or whatever?
6    MS. LORENC: You can answer.
7 BY THE WITNESS:
8    A. I was promoted.
9 BY MR. BROOKS:
10    Q. Oh. But you were still working for
11 Bechtel, right?
12    A. Yes, I was promoted.
13    Q. Promoted to what?
14    A. Electrical and instrumentation field
15 engineer.
16    Q. What did you do as electrical field --
17 what type of job is that?
18    A. I interpret the drawings that come out
19 from the engineering office and interpret them to be
20 built, physically executed and built in the field.
21    Q. What --
22    A. As to your question --
23    Q. Sorry, didn't mean to cut you off.
24       What do you mean by drawings? What

Page 14

1  do you mean?
2      A.  Electrical and instrumentation drawings
3  that are designed by the engineers in the engineering
4  office.
5      Q.  Construction drawings, right?  For the
6  most part, right?  Not just --
7      A.  Yes.
8      Q.  A fifth grader can draw this stuff --
9      A.  Yes.
10     Q.  -- construction drawing.
11          How long did you work in that
12  position?
13     A.  Approximately two years.
14     Q.  What did you do after that?
15     A.  I was -- I took another job.
16     Q.  With Bechtel?
17     A.  With another company.
18     Q.  So make sure we talking the same.
19     A.  I got a lot of jobs.  Go ahead, I'm
20  sorry.
21     Q.  So from 1989 until about 1992 you worked
22  for Bechtel?
23     A.  '93.
24     Q.  1993 you worked for Bechtel?

Page 15

1      A.  (Nodding).  Yes.
2      Q.  Mr. Hamm, where are you from?
3      A.  Originally?
4      Q.  Yeah.
5      A.  Houston, Texas.
6      Q.  Were you born there?
7      A.  Yes, sir.
8      Q.  You go to high school?
9      A.  Yes, sir.
10     Q.  You graduate?
11     A.  Yes, sir.
12     Q.  Go to college?
13     A.  Some.
14     Q.  Did you go or not?
15     A.  I went.
16     Q.  How many years of college did you went?
17     A.  Approximately 25 credit hours.  Is that
18  1.1 something.
19     Q.  What college did you go to?
20     A.  Rasel Sport two-year college, Delmar
21  College, and Columbia Southern for something.
22     Q.  So you had 24 hours between the three
23  colleges?  25 hours between three colleges?
24     A.  I think so.

Page 16

1      Q.  You have a degree?
2      A.  No, sir.
3      Q.  You have certifications?
4      A.  Yes, sir.
5      Q.  You have its own type certification?
6      A.  Yes, sir.
7      Q.  What type?
8      A.  I made construction health and safety
9  technician with the Board of Certified Safety
10  Professionals.  It a legally --
11     Q.  What other kind of certifications?
12     A.  OSHA outreach trainer.
13     Q.  What else?
14     A.  There's several.
15     Q.  So the most important one you have is the
16  one you mentioned first.  What's the name of that one
17  again?
18     A.  Construction -- CST, construction health
19  and safety technician.
20     Q.  What's the requirement for certification,
21  to get certification you have?
22     A.  Years of service and passing a test.
23     Q.  How many years of service?
24     A.  I think the minimum is five.

Page 17

1      Q.  Is it state certified?  Not sure?  You're
2  not going to say yes, no or whatever?
3      A.  It's a Board of Certified Safety
4  Professionals which is a non-profit organization for
5  the industry.  So I assume it's national.  It's
6  recognized.
7      Q.  Any other type of certification similar
8  to that which is national certification type?
9      A.  Not current.  I think -- not current at
10  this time.
11     Q.  Did you ever have anything --
12     A.  I did.  I had others.
13     Q.  You had others?
14     A.  They are not currently current.
15     Q.  Can you give me a couple of them?
16     A.  Smith System defensive driving
17  instructor, RF learner trainer, industrial hygiene
18  technician.  If I can continue, Intergraph micro
19  station operator.
20     Q.  Were most of those online type
21  certifications?
22     A.  What?
23     Q.  Online type of certifications.
24     A.  Online?

5 (Pages 14 - 17)

Page 18

1    Q.  Online, computer-based.
2    MS. LORENC:  Online.
3 BY THE WITNESS:
4    A.  Well, no, those were classroom
5 certifications.
6 BY MR. BROOKS:
7    Q.  Offered by your employee?
8    A.  Some.
9    Q.  Paid by your employee?
10   A.  Some.
11   Q.  What's the total amount of time you
12 worked for Bechtel?  Over the past 5 years, 15, 18?
13   A.  18 and a half years I believe was my
14 total continuous service.
15   Q.  At that time you worked as an employee?
16   A.  I didn't hear the question.
17   Q.  At that time you was an employee, Bechtel
18 employee?
19   MS. LORENC:  Objection to form.  Did you say
20 he was a Bechtel employee?
21   MR. BROOKS:  Right.
22 BY THE WITNESS:
23   A.  Yes, I was a Bechtel employee.
24 BY MR. BROOKS:

Page 19

1    Q.  What type of organization is Bechtel?
2    A.  A diversified, worldwide family-owned
3 engineering construction company.
4    Q.  So they do what, they build what?
5    A.  Whatever you need.
6    Q.  What typically do they build, do some of
7 the projects?
8    A.  There is no typical.
9    Q.  Can you name some of the products that
10 Bechtel has built or building?
11   A.  Sure.  The Hoover Dam was their signature
12 project.  The Boston central artery.
13   Q.  Is that the one where the tiger fell and
14 killed the guy and sued Bechtel out of a million
15 dollars?  That's the one you are talking about?
16   A.  I don't know what -- I don't know
17 anything about that.
18   Q.  Oh, really?
19   MS. LORENC:  Objection.  Asked and answered.
20 BY MR. BROOKS:
21   Q.  You work for Bechtel in 2006, '7, '8?
22 You worked for Bechtel?
23   A.  Yes.
24   Q.  When did Bechtel build this particular

Page 20

1 project?
2    MS. LORENC:  Objection to form.  Which
3 particular project?
4 BY MR. BROOKS:
5    Q.  The Boston one you were talking about.
6    A.  It was 20 years long project.
7    Q.  When did they complete it?
8    A.  I don't know.
9    Q.  You don't know?
10   A.  I do not.
11   Q.  When do you think they completed it?
12   MS. LORENC:  Objection.  Relevance.
13      You can answer.
14 BY THE WITNESS:
15   A.  I don't know.
16 BY MR. BROOKS:
17   Q.  Name some other projects.
18   A.  Lativa Shell Refinery, the L&G Sabine
19 River project currently under way.  The Romanian --
20 or the Transylvania motorway, Croatian motorway, Hong
21 Kong Airport, Costa Rica Airport.
22      You want me to continue?
23   Q.  So did they build projects other than --
24 let me rephrase a different way.

Page 21

1      Did Bechtel ever build or have any
2 kind of telecommunication project that you worked on
3 or aware of since 1989?
4    A.  Yes.
5    Q.  What were they that you recall?
6    A.  Sprint Communications, AT&T, Singular.
7    Q.  Did you work on any of those?
8    A.  Yes, sir.
9    Q.  Which ones?
10   A.  AT&T, Singular Wire.
11   Q.  What year did you work for AT&T?
12   A.  2001 through 2006.
13   Q.  Are you familiar with employment
14 qualifications Bechtel has in terms of hiring people?
15   MS. LORENC:  Objection to form.
16 BY MR. BROOKS:
17   Q.  What are some of the requirements to work
18 for Bechtel?
19   MS. LORENC:  Same objection.
20 BY THE WITNESS:
21   A.  I don't know.
22 BY MR. BROOKS:
23   Q.  So if Bechtel was to hire you as an
24 engineer, what would they require?

6 (Pages 18 - 21)

Page 22

1    MS. LORENC: Objection to form.
2        You can answer.
3 BY THE WITNESS:
4    A. Engineering degree.
5 BY MR. BROOKS:
6    Q. If they were to hire you for any position
7 that was non-administrative would they require a
8 degree of any sort?
9    MS. LORENC: Objection. Form.
10 BY MR. BROOKS:
11    Q. Are you aware whether or not they require
12 a degree --
13    A. I didn't hear the question.
14    Q. If a person was working for Bechtel and
15 apply for Bechtel as any position other than admin
16 would part of the qualification require be a degree
17 in something?
18    MS. LORENC: Objection. Form and to
19 relevance.
20 BY THE WITNESS:
21    A. No.
22 BY MR. BROOKS:
23    Q. They would not?
24    A. No.

Page 23

1    Q. Really?
2    A. Yes.
3    Q. And you know that because you didn't have
4 one and they hired you for 18 years, right?
5    MS. LORENC: Objection. Argumentative.
6        You can answer.
7 BY MR. BROOKS:
8    Q. You have personal awareness of this?
9    A. I do.
10    Q. Because they hired you, right?
11    A. Yes.
12    Q. When you worked for AT&T -- Bechtel in
13 2001, where did you work? You worked for Bechtel,
14 but what was the location?
15    A. I covered the East Coast east of the
16 Mississippi for AT&T 3G.
17    Q. What are some of the states?
18    A. All states east of the Mississippi.
19    Q. All of them?
20    A. Yes, sir.
21    Q. So you worked in North Carolina?
22    A. Yes. We didn't have any work there.
23    Q. So tell me what states then.
24    A. Florida, Georgia, New York, New Jersey,

Page 24

1 Massachusetts, Pennsylvania.
2    Q. Is that considered East Coast, New York,
3 New Jersey?
4    A. Yes.
5    Q. Okay, go ahead.
6    A. Detroit, Michigan; Ohio, West Virginia,
7 Virginia.
8    Q. You work in all those states?
9    MS. LORENC: Objection. Relevance.
10    MR. BROOKS: They relevance.
11 BY MR. BROOKS:
12    Q. What states did you work in --
13    MS. LORENC: Objection. Relevance.
14 BY MR. BROOKS:
15    Q. -- for Bechtel in 2001?
16    MS. LORENC: Objection. Relevance.
17        You can answer if you recall.
18 BY THE WITNESS:
19    A. I covered the east coast which cover all
20 states east of the Mississippi.
21    Q. The question is did you work in
22 Tennessee?
23    A. I don't recall if I worked in 2001 in
24 Tennessee.

Page 25

1    Q. You don't recall?
2    A. I do not recall.
3    Q. You work in Virginia in 2001?
4    A. Most likely.
5    Q. South Carolina?
6    MS. LORENC: Objection. Relevance. I am not
7 sure where this is going. This has nothing to do
8 with SAC Wireless.
9    MR. BROOKS: It has to do with whatever I
10 want to ask.
11    MS. LORENC: Well, you have until 4:00.
12    MR. BROOKS: I have until I'm done. Eight
13 hours.
14    MS. LORENC: No, you don't have eight hours.
15    MR. BROOKS: I do have eight hours.
16    MS. LORENC: No, you have seven hours.
17    MR. BROOKS: I have seven hours.
18    MS. LORENC: If you want to take Kevin Pope's
19 deposition at 4:00 o'clock today, you have an hour
20 and a half. If you remember where you --
21    MR. BROOKS: Off the record for a minute. Go
22 off the record. I'm going to ask you politely, okay?
23    MS. LORENC: You turn that videocamera off if
24 you're going off the record.

7 (Pages 22 - 25)

Page 26

```
1       MR. BROOKS: I will turn it off.
2           (WHEREUPON, a discussion was held
3           off the record.)
4       MR. BROOKS: Because you have to give him
5   advice, you know, from your person, then I think you
6   just say, hey, I want to talk to my lawyer or
7   whatever and just do that.
8       MS. LORENC: He absolutely does not have to
9   do that.
10      MR. BROOKS: He don't have to do that?
11      MS. LORENC: No, he does not have to tell you
12  why he wants to take a break.
13      MR. BROOKS: Then I don't have to tell you
14  why I am late.
15      MS. LORENC: I didn't tell you --
16      MR. BROOKS: We are done.
17  BY MR. BROOKS:
18      Q.  You feel okay?
19      A.  I am good.
20      Q.  I forgot to ask you that question. Maybe
21  I should. Let's go back on the record. So,
22  Mr. Hamm, how you feeling today?
23      A.  I feel fine.
24      Q.  You feel fine. Well rested?
```

Page 27

```
1       A.  Yes, sir.
2       Q.  You think you up to answer questions at
3   the deposition?
4       A.  Yes.
5       Q.  You feel up to answering the questions?
6       A.  Yeah.
7       Q.  Thank you.
8           Mr. Hamm, in 2001, you said you were
9   working for Bechtel in telecommunication area, right?
10      A.  Yes.
11      Q.  What was your title?
12      MS. LORENC: Objection. Form.
13          You can answer.
14  BY THE WITNESS:
15      A.  ESH supervisor.
16      Q.  What is ESH supervisor?
17      A.  Environmental, safety and health.
18      Q.  So what were you responsible for as that
19  supervisor? What were you responsible for?
20      A.  Managing environmental, safety and
21  health.
22      Q.  During that time you said Bechtel were
23  working AT&T 3G?
24      A.  Correct.
```

Page 28

```
1       Q.  Was Bechtel actually doing the physical
2   construction?
3       A.  Not that I recall.
4       Q.  You don't recall?
5       A.  (Nodding.)
6       Q.  What was Bechtel?
7       A.  Project management.
8       Q.  So Bechtel hired contractors to do the
9   work, right?
10      MS. LORENC: Objection. Relevance.
11          You can answer if you know.
12  BY THE WITNESS:
13      A.  As far as I recall.
14  BY MR. BROOKS:
15      Q.  Who did the work then?
16      MS. LORENC: I am going to make a standing
17  objection to asking questions about -- excuse me.
18      MR. BROOKS: I can ask any question I want.
19      MS. LORENC: And I'm allowed to make an
20  objection.
21      MR. BROOKS: Make them.
22      MS. LORENC: And, for the record, we have a
23  court reporter here who can only take down one
24  person's comments at a time. So please allow me to
```

Page 29

```
1   finish before you interrupt because the court
2   reporter will not be able to get that down. I am
3   making a standing objection for the purpose of being
4   able to move this along and not having to object to
5   each one of your questions, about anything related to
6   Bechtel and Mr. Hamm's employment at Bechtel as to
7   its lack of relevance, to anything related to your
8   lawsuit against SAC Wireless.
9           You may proceed.
10      MR. BROOKS: Yes, I see why you shaking your
11  head and all.
12      THE WITNESS: I didn't hear that.
13      MS. LORENC: Objection to the end of a
14  comment.
15      MR. BROOKS: Okay. You say you made
16  a statement, Jeff. Objection. You still don't
17  object.
18      THE WITNESS: What was that?
19      MS. LORENC: I am not going to object to -- I
20  will not be objecting to the relevance. I retain the
21  ability to reject to object on other grounds.
22      MR. BROOKS: I suggest that, Susan, read my
23  EEO suit complaint, okay? I suggest you read it.
24      MS. LORENC: I have read it.
```

8 (Pages 26 - 29)

Page 30

1     MR. BROOKS: I suggest you read it.
2     MS. LORENC: I've read it.
3     MR. BROOKS: Well, re-read it.
4 BY MR. BROOKS:
5     Q. Describe your duties and responsibilities
6 from 2001 to 2006 with Bechtel as you worked for
7 Bechtel. What were your duties? What
8 responsibilities? Some in that area. What were you
9 supposed to do?
10     A. I was environmental, safety and health
11 regional manager supervisor.
12     Q. That's your title, right?
13     A. That was my title.
14     Q. What was your duties?
15     A. Responsible for environmental, health and
16 safety for all work being performed on behalf of
17 Bechtel.
18     Q. So what were some of your duties?
19     A. Managing environmental, safety and
20 health.
21     Q. Whose environmental, safety and health?
22     A. Those of our people and our contractors
23 as much as I could.
24     Q. Describe how you managed them. How you

Page 31

1 managed the environmental safety and health.
2     A. I don't recall.
3     Q. You do recall.
4     MS. LORENC: Objection. Argumentative.
5 Asked and answered.
6 BY MR. BROOKS:
7     Q. I am going to keep asking. You have to
8 answer the question.
9     MS. LORENC: He did answer the question.
10     MR. BROOKS: He didn't answer the question.
11     MS. LORENC: He answered the question "I do
12 not recall." That is his answer.
13     MR. BROOKS: Okay.
14 BY MR. BROOKS:
15     Q. Jeff, was one of your duties and
16 responsibilities was to visit job sites?
17     MS. LORENC: Objection to form.
18     You can answer.
19 BY THE WITNESS:
20     A. I had a varied job description.
21 BY MR. BROOKS:
22     Q. I asked you for it.
23     A. Hm-hm.
24     Q. Just give it to me.

Page 32

1     A. I supported the crews, all tasks related
2 to Environmental, Health & Safety.
3     Q. I don't know what those tasks are.
4     A. Okay.
5     Q. So I am asking you to tell me those
6 tasks.
7     A. Whatever was required of me at the time.
8     Q. So if you were required to go jump off a
9 bridge would you go do it?
10     MS. LORENC: Objective. Argumentative.
11 BY MR. BROOKS:
12     Q. Just describe your job responsibilities.
13     A. My job responsibilities are proprietary
14 to Bechtel at that time.
15     Q. It's not proprietary.
16     A. Sure.
17     Q. It's not proprietary now.
18     MS. LORENC: Mr. Brooks, you have asked a
19 question. He has answered it. You didn't get the
20 answer you wanted but he answered it.
21     MR. BROOKS: You think so?
22     MS. LORENC: You can stare at me as long as
23 you want. The record will reflect you asked a
24 question and he answered it.

Page 33

1     MR. BROOKS: He did not answer the question.
2     MS. LORENC: He didn't answer to your
3 expectation.
4 BY MR. BROOKS:
5     Q. Well, one of your duties and
6 responsibility was to visit job sites?
7     A. Yes.
8     Q. And when you visit job site, what would
9 you check? What were you looking for?
10     A. The environmental, health and safety of
11 the workers at the site.
12     Q. What are some of the things you look for?
13     A. PP, fall protection.
14     Q. What else?
15     A. Rigging. It was a varied checklist.
16     Q. Were you also -- if a contractor was not
17 in compliance, did not meet what you were checking,
18 looking for, were you responsible for to correct
19 those things?
20     A. That was an option.
21     Q. It was an option?
22     A. There's a process and protocol for
23 managing safety on a site.
24     Q. Why don't you give it to me. Tell me

9 (Pages 30 - 33)

Page 34

1 what it is and put it on the record and keep going.
2    A. Sometimes I can correct things on the
3 site, sometimes I have to shut the site down and
4 correct it in a larger fashion.
5    Q. What were some of the things that would
6 cause you to shut a site down?
7    A. Imminent danger.
8    Q. What do you mean by that?
9    A. A person over 6 feet in the air and not
10 tied off.
11    Q. What are some of the other things?
12    A. Failure to have proper equipment, proper
13 training.
14    Q. How do you know when not to have proper
15 training?
16    A. They carry training certificates with
17 them.
18    Q. So you check training certificates when
19 you onsite?
20    MS. LORENC: Objection. Form.
21      You can answer if you recall.
22 BY THE WITNESS:
23    A. I did.
24

Page 35

1 BY MR. BROOKS:
2    Q. That was one of your responsibilities to
3 check training certificates, right?
4    A. It was.
5    Q. At the site?
6    A. It was.
7    Q. Would you shut a site down because they
8 didn't have proper training certificate? Is that a
9 reason?
10    A. It's possible.
11    Q. So what kind of things would you correct
12 onsite and that the work continue?
13    A. PPE, job safety analysis.
14    Q. What's PPE?
15    A. Hard hat, safety glasses, proper
16 footwear.
17    Q. You check for those things?
18    A. Yes, I did.
19    Q. What else? Anything else?
20    A. Whatever was related to environmental,
21 health and safety.
22    Q. You tell us. Tell me, I mean, and the
23 people that are going to be listening to your
24 testimony.

Page 36

1    A. I would check for environmental
2 conditions, health condition and safety conditions.
3    Q. Are contractors required to have
4 documentation?
5    A. Yes.
6    Q. What type?
7    MS. LORENC: Objection to form. Are you
8 referring to while working at Bechtel? What year?
9    MR. BROOKS: Still 2001 to 2006 I am talking
10 about.
11    MS. LORENC: While he was employed by
12 Bechtel?
13    MR. BROOKS: Right.
14    MS. LORENC: Who is not a party to this
15 action.
16    MR. BROOKS: He is a party to the lawsuit.
17    MS. LORENC: You think Bechtel is party to
18 this litigation?
19    MR. BROOKS: Will you continue, please.
20    MS. LORENC: No, hold on one second. Bechtel
21 is absolutely not a party to this litigation.
22    MR. BROOKS: You don't know -- they are not a
23 party to it, okay?
24    MS. LORENC: Okay. You admit they are not a

Page 37

1 party to this litigation?
2    MR. BROOKS: No, what I am saying to you is I
3 can ask questions about Bechtel, I can ask questions
4 about what he did in high school, college or anything
5 that going to lead me to find out what happened with
6 my application and my effort to gain employment with
7 SAC Wireless.
8    THE WITNESS: I want to go off the record.
9    MR. BROOKS: You can't go off the record.
10    MS. LORENC: We will be going off the record,
11 please.
12    MR. BROOKS: Why you want to go off the
13 record?
14    THE WITNESS: I want to go off the record
15 with the camera too.
16    MR. BROOKS: Okay.
17    (WHEREUPON, a discussion was held
18      off the record.)
19    MR. BROOKS: Go back on the record.
20      You should have left it on the
21 record because if you are going to talk that way to
22 me, I want it on the record. In fact, I won't turn
23 my camera off anymore.
24 BY MR. BROOKS:

10 (Pages 34 - 37)

Page 38

1    Q.  ESH management with Bechtel, did you work
2  in Florida for Bechtel?
3        MS. LORENC:  Objection to form.
4        You can answer if you recall.
5  BY THE WITNESS:
6    A.  Yes.
7  BY MR. BROOKS:
8    Q.  Did you work in South Florida, Miami?
9    A.  Yes.
10   Q.  West Palm Beach?
11   A.  Yes.
12   Q.  Do you know the time frame you were in
13 West Palm Beach?
14   A.  I don't recall.
15   Q.  2001? 2002?
16   A.  I don't recall.  I am sure.
17   Q.  As ESH manager were you responsible for
18 documenting health and safety issues on job sites
19 when you were working in Florida 2001, '2, whatever
20 those years?
21   A.  I am sure I was.
22   Q.  Do you recall during that time frame 2001
23 to 200 -- maybe '2, '3 a safety incident at a job
24 site where a contractor was killed?  Do you?

Page 39

1    A.  Where?
2    Q.  In south Florida area, West Palm Beach
3  Miami, south Florida area, during the time period
4  when you were working down there, do you remember a
5  fatality on the job site?
6    A.  I do.
7    Q.  Can you give me the details of it?
8    A.  I will not.
9    Q.  You will.
10   A.  No, I will not.
11   Q.  Why you won't?
12   A.  I will not give you the details of that
13 event. Tell me which one you are asking about
14 because there are more than one.
15   Q.  It was more than one?
16   A.  Tell me which one you're asking.
17   Q.  I am asking you about the one that
18 happened in 2000 -- between 2001 and 2003.
19   A.  There were -- I would have to look.
20 There were close to 17 fatalities in the nation
21 during that time.
22   Q.  I am talking about when you worked in
23 West Palm Beach, Miami south Florida area under your
24 watch.

Page 40

1        MS. LORENC:  Objection.
2  BY MR. BROOKS:
3    Q.  You were the ESH safety manager at that
4  time frame.  That's the one I am talking about.
5    A.  That's proprietary.
6    Q.  It's not proprietary?
7    A.  It is.
8    Q.  It's not.
9        MS. LORENC:  Objection.
10 BY MR. BROOKS:
11   Q.  What's proprietary about it? (QUESTION
12 CERTIFIED.)
13
14   A.  Probably still in litigation.
15   Q.  Public record.  I am asking you, sir.
16   A.  Then go look it up.  I'm not divulging
17 any proprietary information from Bechtel.  You are
18 not getting it from me.
19   Q.  It's public information.
20   A.  Then go look it up on the internet.
21   Q.  I am asking you.
22   A.  No.
23   Q.  You refuse to answer the question?
24   A.  It's not open for discussion.

Page 41

1    Q.  It is open for discussion.  You are
2  right, it's not open for discussion.  You have to
3  answer the question whether you like it or not.
4    A.  -- (inaudible) the investigation and it
5  was proprietary.
6        MS. LORENC:  We will certify the question for
7  the record.  The witness --
8        MR. BROOKS:  We are not.  I am.  Because you
9  are going to come back here again next time in
10 Florida.  You refuse to answer the question.
11       MS. LORENC:  Yes, the record will reflect he
12 is refusing --
13       MR. BROOKS:  You can't answer for him.  He
14 has to answer.
15       THE WITNESS:  It's proprietary.
16 BY MR. BROOKS:
17   Q.  You still answer the question.
18   A.  Deal with Bechtel if you want the
19 information.
20   Q.  Are you refusing to answer the question,
21 sir?
22   A.  It's not public information for you to
23 have.  Unless you -- whatever is on the internet, go
24 get.

11 (Pages 38 - 41)

Page 42

1    Q.  Like you do, right?
2    MS. LORENC: Objection. Argumentative.
3 BY MR. BROOKS:
4    Q.  During 2001 and 2003, at a Bechtel job
5 site did a contractor lose his life?
6    A.  I think so.
7    Q.  How did he lose his life? What happened?
8    A.  I am not going into details. That's
9 proprietary investigation and I am not been released
10 by Bechtel to discuss it.
11   Q.  Bechtel ordered you not to discuss it?
12   MS. LORENC: Objection. Misstates his
13 testimony. Goes to nothing about this lawsuit. He
14 has been asked the question and he's answered it.
15 BY MR. BROOKS:
16   Q.  Did Bechtel tell you not to answer?
17   A.  It's proprietary information. It's
18 protocol.
19   Q.  That's another question the judge is
20 going to get you to answer.
21   A.  Let the judge ask me.
22   Q.  Between you and SAC.
23   A.  This has nothing to do with SAC.
24   Q.  Yeah, it does.

Page 43

1        So you want to pick and choose which
2 questions to ask?
3    MS. LORENC: Move on, please.
4    MR. BROOKS: Don't tell me to move on.
5    MS. LORENC: You have asked the question —
6    MR. BROOKS: I ask him does he want to pick
7 and choose the question.
8    MS. LORENC: Objection. Argumentative.
9 BY MR. BROOKS:
10   Q.  Do you?
11   A.  I didn't hear the question.
12   Q.  I said do Mr. Hamm want to pick and
13 choose what questions is asked of him?
14   A.  I will answer questions that I am able to
15 answer.
16   Q.  That's all we ask.
17   A.  Okay.
18   Q.  All I ask.
19        When did you leave Bechtel?
20   A.  September 2013.
21   Q.  September 2013?
22   A.  September 2013.
23   Q.  Why did you leave?
24   A.  Voluntary.

Page 44

1    Q.  As ESH manager working on construction
2 telecommunication construction project with Bechtel,
3 did you interact with Bechtel construction managers?
4    A.  Did I interact with?
5    Q.  Did you interact with Bechtel
6 construction managers?
7    MS. LORENC: Objection. Form. You can
8 answer.
9 BY THE WITNESS:
10   A.  Yes.
11 BY MR. BROOKS:
12   Q.  In what ways?
13   A.  Whatever way they needed me to.
14   Q.  Tell me some of them.
15   A.  Supporting work plans, safe work plans,
16 fall protection plans, JSAs, mops, migratory bird
17 issues. Things of that nature.
18   Q.  Did you visit a work location?
19   A.  Yes, I did.
20   Q.  Did you conduct training?
21   A.  Yes, I did.
22   Q.  Did you visit job sites with the
23 construction manager?
24   A.  Yes, I did.

Page 45

1    Q.  During 2001, 2003 do you recall working
2 with me or visit with me or talking to me or training
3 me?
4    A.  Training you on multiple occasions.
5    Q.  Was part of your responsibility as ESH
6 safety manager with Bechtel, was it to get feedback
7 to the construction manager in terms of the safety
8 awareness, training?
9    A.  I don't recall.
10   Q.  You don't recall giving feedback?
11   A.  Not specific.
12   Q.  You never had discussions with safety
13 manager about things they should be aware of?
14   A.  I am sure I did.
15   Q.  You are sure you did. Okay. Did you
16 give feedback to the construction manager manager in
17 regard to construction manager abilities?
18   A.  Repeat the question, please.
19   Q.  Did you give feedback to the construction
20 manager managers regarding the construction manager
21 ability in terms of safety, enforcing safety rules
22 and stuff like that?
23   A.  I don't recall anything specific. I
24 don't recall.

12 (Pages 42 - 45)

Page 46

```
1     Q. Would that be part of your
2  responsibility?
3     A. I don't recall.
4     Q. Your responsibility with SAC Wireless do
5  you give feedback to the construction managers?
6     MS. LORENC: Objection to form. You can
7  answer.
8  BY THE WITNESS:
9     A. Yes.
10 BY MR. BROOKS:
11    Q. But you didn't do it with Bechtel?
12    A. I don't recall.
13    Q. You don't recall?
14    A. I don't recall.
15    Q. Another question I am going to ask the
16 judge to administer.
17       In 2006, 2007 -- from 2005 and 2008
18 were you still working for Bechtel?
19    A. Yes.
20    Q. What was your title or position?
21    A. ESH manager. ESH manager 2.
22    Q. What area did you cover?
23    A. Depends on what project I was on.
24    Q. Telecommunication project, what areas?
```

Page 47

```
1     A. Southeast region.
2     Q. What was Florida part of that region?
3     A. Yes, it was.
4     Q. Did you cover the whole area?
5     A. Yes, sir.
6     Q. Did you interact with the construction
7  managers?
8     MS. LORENC: Objection as to form.
9  BY THE WITNESS:
10    A. Yes.
11 BY MR. BROOKS:
12    Q. In what ways?
13    A. Guidance and support.
14    Q. Training?
15    A. Training.
16    Q. Site visit?
17    A. Site visits.
18    Q. Do you recall interacting with me during
19 that time period?
20    A. Can yu be more specific?
21    Q. Do you recall communicating with me,
22 offering me guidance, support, all that stuff --
23    A. Yes.
24    Q. -- that you just stated?
```

Page 48

```
1     A. Once or twice.
2     Q. Only once or twice?
3     A. Yes.
4     Q. Just one or two times?
5     A. I don't recall.
6     Q. You don't recall?
7     A. I recall our conversation where you
8  called me. That's about what I recall.
9     Q. What conversation was that?
10    A. Where you called me.
11    Q. You mean if I called you --
12    A. Yeah.
13    Q. Okay.
14    A. When you called me.
15    Q. Did you receive many calls from me?
16    A. No.
17    Q. No? One maybe?
18    A. Maybe one.
19    Q. Maybe one?
20    A. (Nodding.)
21    Q. Do you recall receiving a call from any
22 construction managers? Did you receive calls from
23 other construction managers?
24    A. Yes.
```

Page 49

```
1     Q. One?
2     A. Don't recall.
3     Q. Two?
4     A. I don't recall.
5     Q. Construction manager did not interact
6  with you that much. Is that what you are saying?
7     MS. LORENC: Objection. Misstates testimony.
8     Q. I am asking him to tell me.
9  BY MR. BROOKS:
10    Q. "I don't recall" -- you are not telling
11 me anything.
12    A. I don't know the number of calls.
13    Q. I know. You interact with a lot with
14 construction manager, right? Right?
15    MS. LORENC: Between 2005 and 2007 while an
16 employee at Bechtel?
17    MR. BROOKS: No, I am talking about employee
18 in this particular market.
19    MS. LORENC: Between 2005 and 2007?
20    MR. BROOKS: Whatever.
21    MS. LORENC: Do you recall how many times you
22 talked to someone 13 years ago?
23    THE WITNESS: No, I do not.
24 BY MR. BROOKS:
```

13 (Pages 46 - 49)

Page 50

1  Q.  Did you ever ask --
2      MS. LORENC: For the record, you did say how
3  many times.
4  BY MR. BROOKS:
5      Q.  How many times then?
6      A.  I don't recall.
7      Q.  Was it like very rarely, like one time?
8      A.  I don't recall.
9      Q.  If I showed you documents would that help
10  your memory?
11      A.  Maybe.
12      Q.  As your attorney says, this is not about
13  Bechtel so we will wait for that document to show up.
14  Okay?
15      A.  Up to you.
16      Q.  I know it's up to me.
17          Do you recall during that time
18  frame, 2005, I'm not really sure because like you I
19  wasn't there for a long time, Bechtel office
20  location, market location?
21      A.  What is the question?
22      Q.  Do you recall the location of Bechtel
23  office in Florida -- not Florida, Orlando area? Do
24  you recall?

Page 51

1      A.  There were several locations.
2      Q.  Which one -- there's one in -- do you
3  recall that? Do you recall one in Macon?
4      A.  I do. I couldn't take you to it.
5      Q.  I probably couldn't find my way. I
6  agree. What was the other location? We agree that
7  one in Macon, right? What was the other one?
8  Orlando area?
9      A.  There were several.
10      Q.  What was --
11      A.  I don't know.
12      MS. LORENC: Objection to the relevance of
13  this line of questioning.
14  BY MR. BROOKS:
15      Q.  Do you remember who the market manager
16  was in the Orlando office in Macon?
17      MS. LORENC: Objection to form.
18  BY THE WITNESS:
19      A.  Be more specific.
20  BY MR. BROOKS:
21      Q.  Who was the market manager for Bechtel in
22  the Macon, Florida office during 2005, 2007 time
23  frame?
24      A.  There were more than one. Be more

Page 52

1  specific.
2      Q.  Do you remember a Bechtel employee named
3  Ed Heimer?
4      A.  Yes, I do.
5      Q.  Do you remember -- do you recall his job
6  title?
7      A.  Yes, I do.
8      Q.  What was it?
9      A.  Market manager.
10      Q.  Do you recall any other market managers
11  in the office?
12      A.  I didn't understand that.
13      Q.  Do you recall any other market managers
14  in the office?
15      A.  At different time frames.
16      Q.  During that time frame.
17      A.  Yes.
18      Q.  Who are they?
19      A.  What's that?
20      Q.  Can you give me a name?
21      A.  Paul Hemingway.
22      Q.  Paul Hemingway. Okay. Who else?
23      A.  Hm?
24      Q.  Who else?

Page 53

1      A.  Market manager of Orlando.
2      Q.  Any other market managers?
3      A.  I just said.
4      Q.  Any other market managers?
5      A.  Not that I recall.
6      Q.  Do you recall an employee named Steve
7  Jempson?
8      A.  I do.
9      Q.  What was his title?
10      A.  I don't recall.
11      Q.  You don't recall.
12      A.  Exactly. Don't recall.
13      Q.  Did you interact with him?
14      A.  I did.
15      Q.  Quite a bit?
16      A.  Yes.
17      Q.  For what was he responsible for as
18  related to --
19      A.  He was my designated safety
20  representative for that market.
21      Q.  Oh, okay. Okay.
22      A.  I don't know -- remember what his other
23  title was.
24      Q.  So he worked for you?

14 (Pages 50 - 53)

Page 54

1    A. No, he did not work for me.
2    Q. What was his role as your designated
3 safety manager?
4    A. What's that?
5    Q. What was his role as your designated
6 safety manager?
7    A. To support safety in the market.
8 Environmental health and safety in the market.
9    Q. Did you select him?
10    A. No, I did not.
11    Q. Were you responsible for him in terms of
12 safety?
13    A. No.
14    Q. Was he responsible to you?
15    A. No.
16    Q. Do you recall an incident during that
17 same time frame, 2005, 2007, where a contractor threw
18 a jumper off the tower?
19    A. Not directly, no.
20    Q. You don't directly? Really?
21    A. Not directly.
22    Q. You don't recall it?
23    A. Hm?
24    Q. You don't recall it?

Page 55

1    A. Be more specific with your question,
2 please.
3    Q. Okay. Do you recall an incident at a job
4 site where a contractor threw a jumper off the
5 (inaudible) piece of equipment off the top of a
6 200-foot set top?
7    A. I recall you calling me and telling me
8 that that occurred.
9    Q. Okay. But do you --
10    A. I recall that phone call, yes, I do.
11    Q. Did you investigate it?
12    A. Yes.
13    Q. What did your investigation show?
14    MS. LORENC: Objection. Relevance to this
15 entire line of questioning.
16         You can answer.
17 BY THE WITNESS:
18    A. Bechtel proprietary work-product.
19 BY MR. BROOKS:
20    Q. No, it's not.
21    A. Yes, it is. It's work-product.
22    Q. If it's work-product, why did you discuss
23 it with SAC Wireless?
24    A. Why did I discuss it?

Page 56

1    Q. Oh, "I'm famous."
2    A. Oh, yeah.
3    Q. Yeah, yeah.
4    A. Thank you.
5    MS. LORENC: For the record, what -- what
6 were you pointing to?
7    MR. BROOKS: You know what I'm talking --
8    MS. LORENC: I would like the record to
9 reflect whatever it was --
10    MR. BROOKS: I'm not.
11    MS. LORENC: Excuse me. She can only take
12 down one comment at a time.
13    MR. BROOKS: Okay.
14    MS. LORENC: You lifted up a piece of paper
15 and showed it to him for the record. I would like to
16 make clear what it was because I did not see what you
17 lifted up and pointed to.
18    MR. BROOKS: I didn't say he --
19    MS. LORENC: Well, you are speaking on the
20 record, so I would like --
21    MR. BROOKS: No, I didn't say for the record.
22 I just asked him a question.
23    MS. LORENC: Let the record reflect that
24 Mr. Brooks lifted up some piece of paper --

Page 57

1    MR. BROOKS: At some point I am going to
2 introduce it into the record.
3    MS. LORENC: Could you please stop
4 interrupting me.
5    MR. BROOKS: Oh, I'm sorry, Ms. Susan.
6    MS. LORENC: Let the record reflect that
7 Mr. Brooks was gesturing to some unknown document
8 when questioning Mr. Hamm and that he is refusing to
9 identify it for the record what it is.
10    MR. BROOKS: Let the record show that
11 Mr. Hamm admitted that he recognized that document,
12 which will be introduced at a later time.
13    MS. LORENC: There's no question. You are
14 fine.
15 BY MR. BROOKS:
16    Q. So your investigation -- your
17 investigation show -- okay. Did you conduct an
18 investigation?
19    MS. LORENC: Objection. Asked and answered.
20 BY THE WITNESS:
21    A. I don't recall.
22 BY MR. BROOKS:
23    Q. You just said you did recall. Which one
24 is it? You recall for SAC Wireless. You can have

15 (Pages 54 - 57)

Page 58

1 selective memory.
2    MS. LORENC: Objection. Argumentative, asked
3 and answered. Next question.
4    MR. BROOKS: No, that is the next question.
5    MS. LORENC: What's the question?
6 BY MR. BROOKS:
7    Q. The question is how or what did your
8 investigation show or did you investigate it?
9 However you want to word it.
10    MS. LORENC: Well, that's a compound
11 question. What's the question?
12 BY MR. BROOKS:
13    Q. Did you conduct an investigation on the
14 incident where a contractor, a Bechtel contractor
15 threw a jumper off a 200-foot tower?
16    A. I don't recall that I did.
17    Q. You took a -- you are under oath. You
18 just admitted that you do recall.
19    A. I don't recall that I did. Maybe Steve
20 and Ed did.
21    Q. Somebody did?
22    A. Somebody did. I don't recall that I did.
23    Q. Was an investigation conducted?
24    A. I think so.

Page 59

1    Q. Under Bechtel protocol or rules, safety
2 rules, under your safety rules and regulations, isn't
3 that something you enforce in terms of --
4    A. Yes, it is.
5    Q. -- safety rules?
6    A. Yes, it is.
7    Q. Did you enforce it?
8    A. As far as I know we did.
9    Q. You just said you don't recall.
10    A. I don't recall the outcome of the
11 investigation.
12    Q. I didn't ask you the outcome. I asked
13 you did you investigate.
14    MS. LORENC: No, you asked him if he enforced
15 it. What is the question?
16    MR. BROOKS: Susan, this is the second
17 question.
18 BY MR. BROOKS:
19    Q. The first question was did you
20 investigate. And then I had to break it down to you.
21 Now I am asking you as part of your job where people
22 do things that create a safety hazard, like you say,
23 to the environment, to people, property, the whole
24 nine yards. Part of your job was to enforce that,

Page 60

1 right?
2    A. As much as I could, yes.
3    Q. As much as you could.
4       So you weren't able to enforce this
5 particular incident, right?
6    MS. LORENC: Objection. Argumentative,
7 misstates his testimony.
8 BY THE WITNESS:
9    A. I don't recall who did the investigation.
10    Q. But an investigation was conducted,
11 right?
12    MS. LORENC: Objection. Asked and answered.
13 BY THE WITNESS:
14    A. As far as I know, yes.
15 BY MR. BROOKS:
16    Q. By Bechtel?
17    A. Yes.
18    Q. Did you get a written statement from me?
19    A. I don't recall.
20    Q. Don't recall. Did you get a written
21 statement from the contractor that threw the --
22    A. I don't recall.
23    Q. Did you get any kind of written document
24 at all?

Page 61

1    A. I don't recall.
2    Q. Do you recall sending out a memo, safety
3 memo -- you did send those out, right, safety,
4 whatever you call them?
5    MS. LORENC: Objection to form.
6 BY MR. BROOKS:
7    Q. Did you send safety memos out to the
8 field team occasionally?
9    MS. LORENC: When?
10    MR. BROOKS: At any time.
11    MS. LORENC: While working for Bechtel?
12    MR. BROOKS: Right.
13    MS. LORENC: Objection to relevance and to
14 form.
15       Go ahead and answer if you can.
16 BY THE WITNESS:
17    A. Typically not.
18 BY MR. BROOKS:
19    Q. Typically not?
20    A. Typically not.
21    Q. Really? Did you send one out this time?
22    A. I don't recall.
23    Q. Do you recall sending an e-mail informing
24 me that I need to write this document up -- I mean

16 (Pages 58 - 61)

Page 62

1 this issue up?
2     A.  I don't recall.
3     Q.  Did Bechtel have any kind of form or
4 documentation form -- let me rephrase it.
5         As part of the documentation with
6 Bechtel enforcing rules and safety, was that a form
7 called incident form or something like that?
8     A.  Yes.
9     Q.  Do you recall whether or not an incident
10 form was completed on this particular incident?
11     A.  I do not.
12     Q.  You do not.
13         Under your guidance and
14 understanding should one have been done?  Should one
15 have been?
16     A.  I would think so, yes.
17     Q.  Do you recall sending an e-mail
18 requesting me to fill one out, submit it?
19     MS. LORENC: Objection.  Asked and answered.
20 BY THE WITNESS:
21     A.  I do not recall my e-mails from then.
22 BY MR. BROOKS:
23     Q.  You think you would have?
24     MS. LORENC: Objection.  Calls for

Page 63

1 speculation.
2 BY THE WITNESS:
3     A.  I don't know.
4 BY MR. BROOKS:
5     Q.  Were you the safety ESH manager during
6 that time frame?
7     A.  Yes, I was.
8     Q.  And that was part of your job; correct?
9     A.  I would assume so.
10     Q.  You assume?  You assume the job --
11     A.  Yes, that was part of my job.
12     Q.  You didn't do your job?
13     MS. LORENC: Objection.  Argumentative.
14 BY MR. BROOKS:
15     Q.  In this particular incident by my
16 requesting a form you feel that you did your job or
17 didn't do your job?
18     MS. LORENC: Objection.  Misstates his
19 testimony.  He did not say he didn't fill out any
20 form.  He said he doesn't recall.  Mr. Brooks, I have
21 given you a lot of latitude here.  This is completely
22 irrelevant to the lawsuit you filed against SAC
23 Wireless.  We are going to have to end this
24 deposition very soon if you don't move on to the

Page 64

1 claims made against SAC Wireless.
2     MR. BROOKS: You feel blessed?
3     MS. LORENC: There's no question on the
4 table.
5     MR. BROOKS: The question was whether or not
6 an incident form was filled out and completed and
7 submitted to Bechtel.
8     MS. LORENC: And that was asked and answered
9 multiple times which was I don't recall.
10 BY MR. BROOKS:
11     Q.  You don't recall?
12     A.  I don't recall.
13     Q.  Do you recall speaking with the person
14 that threw the jumper off the top?
15     MS. LORENC: Objection.  Asked and answered.
16 BY THE WITNESS:
17     A.  I do not recall.
18 BY MR. BROOKS:
19     Q.  Do you recall the name of the person that
20 threw the jumper off the top?
21     A.  I do not recall.
22     MR. BROOKS: This a taste of what you are
23 going to get tomorrow, "I don't recall."
24     MS. LORENC: I want to ensure that that was

Page 65

1 on the record.
2     MR. BROOKS: Yes, I said a taste -- I am not
3 going to recall.  I am older than him.  He can't
4 recall.
5     MS. LORENC: He is not the one that filed the
6 lawsuit.
7     MR. BROOKS: That's okay.  He is a party.
8     MS. LORENC: Please proceed.
9     MR. BROOKS: He is the reason the lawsuit was
10 filed.
11     MS. LORENC: Please proceed, Mr. Brooks.
12     MR. BROOKS: Okay.
13 BY MR. BROOKS:
14     Q.  Who is your manager at SAC Wireless?  Who
15 is your boss?  Who do you report to?
16     A.  Which time?
17     Q.  Pope -- I mean, okay.  Right now.
18 Between -- let's say between 2016 to the present.
19     A.  Be more specific.
20     Q.  Who was your manager on July 12, 2017?
21     A.  I don't recall.
22     Q.  You have a manager?
23     A.  I do.
24     Q.  Who is your manager now?

17 (Pages 62 - 65)

Page 66

1    A.  Jonathan McKinnley.
2    Q.  What's his title?
3    A.  Chief field services officer.
4    Q.  How long he been your manager?
5    A.  I don't recall.
6    Q.  Was he your manager last year?
7    A.  A short period.
8    Q.  What period?  What period?  What time
9 frame?
10    A.  I don't recall.
11    Q.  Was he your manager in 2016?
12    A.  No.
13    Q.  Who was your manager 2016?
14    A.  Which time?
15    Q.  How many managers did you have in 2016?
16    A.  I don't know.
17    Q.  You don't know?
18    A.  I don't know.  I don't recall.
19    Q.  Did you have a manager in 2016?
20    A.  I did.
21    Q.  What's the name or her name?
22    A.  If it's a her, that would be Nichole
23 Thomas.
24    Q.  If?  It was a her?  It was a her?

Page 67

1    A.  For a period of time in 2016 she was my
2 manager, yes.
3    Q.  Okay.  And who was your manager during
4 the other period?
5    A.  Be more specific.
6    Q.  No, you be more specific.  I asked you a
7 question.
8    A.  I don't recall.
9    Q.  I asked you how many managers you have
10 and what was they name.
11    MS. LORENC:  You have not asked him how
12 managers he had.
13 BY MR. BROOKS:
14    Q.  In 2016 how many managers did you have
15 when you worked for SAC Wireless while working for
16 SAC Wireless?
17    A.  I don't recall specifically.
18    Q.  During 2016, just that one year, how many
19 managers did you have?
20    A.  I don't recall specifically.  I recall
21 one other.
22    Q.  You recall one manager?
23    A.  I don't recall specifically.
24    Q.  You recall two?

Page 68

1    A.  I recall two.
2    Q.  Who were they?
3    A.  Mike Hogan and Nichole Thomas.
4    Q.  Who was the other person?
5    A.  Mike Hogan.
6    Q.  In 2017 who was your manager?
7    A.  I don't recall.
8    MR. BROOKS:  I got a parrot that does the
9 same thing.
10    THE COURT REPORTER:  I'm sorry?
11    MS. LORENC:  He said I have a parrot that
12 does the same thing.
13    MR. BROOKS:  (Inaudible) cracker.
14    MS. LORENC:  Excuse me?
15    MR. BROOKS:  I said except he asks for a
16 cracker.
17 BY MR. BROOKS:
18    Q.  On July 11, 2017, Nichole Thomas was your
19 manager?
20    MS. LORENC:  Is that a question?
21 BY MR. BROOKS:
22    Q.  I am asking you.  Was Nichole Thomas your
23 manager in 2000 -- July 11, 2017?
24    A.  I don't recall.

Page 69

1    Q.  Do you know who Nichole Thomas is?
2    A.  I do.
3    Q.  Who is she?
4    A.  She was a manager at SAC Wireless of
5 national programming.
6    Q.  What was her title?
7    MS. LORENC:  Objection.  Form.
8        You can answer if you know.
9 BY THE WITNESS:
10    A.  I don't recall.
11 BY MR. BROOKS:
12    Q.  Hm?
13    A.  I don't recall her title.
14    Q.  I think you said earlier that she was one
15 of the managers back then?
16    A.  Correct.
17    Q.  So you do recall?
18    MS. LORENC:  Objection.  Argumentative.
19    MR. BROOKS:  Why don't your client just
20 answer the question?
21    MS. LORENC:  He has answered it to the best
22 of his recollection.
23    MR. BROOKS:  "I don't recall" is not the best
24 of your recollection.

18 (Pages 66 - 69)

Page 70

1    MS. LORENC: An answer indicating that he
2  doesn't recall. It's not the answer you apparently
3  want.
4        But you can answer.
5  BY MR. BROOKS:
6    Q.  How is your health?
7    A.  Good.
8    Q.  Good?
9    A.  As far as I know.
10   Q.  You have any memory problems that you are
11  aware of?
12   A.  None that I am aware of.
13   Q.  You have any problem recalling things
14  that happened last night? A week ago?
15   A.  Maybe.
16   Q.  Maybe?
17   A.  Yeah.
18   Q.  Really?
19   A.  Don't know.
20   Q.  You probably got memory problem.
21   MS. LORENC: Mr. Brooks?
22   MR. BROOKS: No, I'm trying to find out why
23  he can't recall things, then he say, oh, yeah. Now
24  he can't recall.

Page 71

1    MS. LORENC: If you want to refresh his
2  recollection with a document, you are welcome to. He
3  has answered your question.
4    MR. BROOKS: She's a lawyer. I am just a
5  wannabe. I just want to make sure, because I know
6  some of these things are hard for you to recall.
7  Some I don't recall. So I am just trying to find
8  out -- part of the reason you're here is to put
9  things together, right? But you give me information
10  to help me with my case. That's all I am asking from
11  you, okay? It's not to prosecute Bechtel, okay?
12  BY MR. BROOKS:
13   Q.  So all I ask you is to help me get where
14  we need to go so we can move forward.
15   A.  Okay.
16   Q.  Okay. And by just answering the
17  question, if you truly don't recall, fine. If you
18  recall and don't want to tell me, it's not fine.
19  Because I am looking at stuff that tell me that you
20  know.
21   A.  Okay.
22   Q.  So you may not recall the exact date, but
23  on July 11, 2017 you shared an e-mail with Nichole
24  Thomas regarding an article in an online magazine

Page 72

1  called Wireless Estimator; correct?
2    A.  Correct.
3    Q.  What was that article about?
4    MS. LORENC: Can I just be clear? You said
5  that he shared it with Nichole?
6    MR. BROOKS: Or Nichole shared it with him.
7  Don't matter.
8    MS. LORENC: Which is it?
9  BY MR. BROOKS:
10   Q.  You and Nichole shared an article.
11   MS. LORENC: No. Who shared -- if you want
12  to show us the document --
13  BY MR. BROOKS:
14   Q.  Nichole shared an article with you. You
15  tell me. Did she share it with you or you share it
16  with her?
17   A.  She found it and shared it with me.
18   Q.  Where did she find it at?
19   MS. LORENC: Objection. He's not Nichole.
20       If you know.
21  BY MR. BROOKS:
22   Q.  Did you and Nichole discuss it?
23   A.  No verbal communication.
24   Q.  She just sent it to you?

Page 73

1    A.  Correct.
2    Q.  What was the article about?
3    A.  About you.
4    Q.  About me what? Rufus Brooks, 65-year-old
5  man, good looking?
6    A.  It's about your litigation.
7    Q.  What litigation?
8    A.  With Bechtel and Mobility. You know what
9  it's about, Rufus. It's public domain.
10   Q.  Oh, there you go, public domain again,
11  huh?
12   MS. LORENC: Mr. Brooks?
13  BY MR. BROOKS:
14   Q.  So this is not confidential, right?
15   A.  No.
16   Q.  It's not?
17   A.  I don't think so. I am not an attorney.
18   MS. LORENC: What is this? What are you
19  pointing to?
20  BY MR. BROOKS:
21   Q.  Let's go back to when you were you ESH
22  safety manager and the incident with the guy throwing
23  the jumper off the top. Okay? You stated that you
24  do not recall who the contractor was, anything,

19 (Pages 70 - 73)

Veritext Legal Solutions

Page 74

1 right?
2    A.  I do not know who the contractor was.
3    Q.  And you stated you don't really recall
4 the incident, right?
5    MS. LORENC:  Objection.  Misstates his
6 testimony.  He testified he recalls you calling him
7 about the incident.
8    MR. BROOKS:  Right.
9 BY MR. BROOKS:
10    Q.  So that's all -- and after I called you
11 what action did you take?
12    MS. LORENC:  Objection.  Asked and answered
13 numerous times.
14    MR. BROOKS:  I am going to ask again.
15 BY MR. BROOKS:
16    Q.  After receiving a call from me did you
17 take any action at all?
18    A.  I am sure I did.  I don't recall
19 specifically in what order and what I did.
20    Q.  And you also testified that you do not
21 recall or did not speak to the contractor that threw
22 the jumper off the tower, right?
23    A.  I do not recall ever speaking to that
24 contractor.

Page 75

1    Q.  And you don't know his name?
2    A.  I do not know his name.
3    Q.  Do you know his name now?
4    A.  If it's in the article, I've read it.
5    Q.  Did you become aware any time between the
6 incident and now that the contractor that threw the
7 jumper off the tower was involved in a fatality
8 accident?
9    A.  I became aware of that through the
10 article.
11    Q.  Through the article.  Do you recall the
12 type of fatality it was?
13    A.  I think was a fall, was it not?  I
14 don't -- I think it was a fall.
15    Q.  And this was the first time you heard
16 anything about this incident, right?
17    MS. LORENC:  Objection.  Form.  Which
18 incident?
19 BY THE WITNESS:
20    A.  What incident?
21 BY MR. BROOKS:
22    Q.  The fall -- anything that happened after
23 the jumper.  You don't recall anything other than
24 that?

Page 76

1    MS. LORENC:  Objection.  Form.
2 BY MR. BROOKS:
3    Q.  When was the first time you became aware
4 that the person that threw the jumper off the tower
5 was involved in a fatality?
6    A.  I only recall from the article.
7    Q.  You were not aware of it while you were a
8 Bechtel employee?
9    A.  I don't recall if I was.
10    Q.  Did you and Nichole Thomas discuss the
11 article, the Wireless Estimator --
12    MS. LORENC:  Objection.
13 BY MR. BROOKS:
14    Q.  The article that she sent you?
15    MS. LORENC:  Objection.  Asked and answered.
16 BY MR. BROOKS:
17    Q.  Did you guys discuss this other than this
18 e-mail?
19    A.  No.
20    Q.  Did she take you up on the offer to
21 discuss it over a glass of beer?
22    A.  No.
23    Q.  Did you offer?
24    A.  No.

Page 77

1    Q.  But you offered it in an e-mail, right?
2    MS. LORENC:  Objection.  Form.  Offer what?
3 BY MR. BROOKS:
4    Q.  You offered to take her out and talk to
5 her over a glass of beer.
6    A.  It was a quip.
7    Q.  You did offer?
8    A.  Yeah.  In the e-mail.
9    Q.  Was Nichole Thomas involved in the hiring
10 process at SAC Wireless?
11    MS. LORENC:  Objection to form.
12        You can answer.
13 BY THE WITNESS:
14    A.  I had no knowledge of the notes.
15 BY MR. BROOKS:
16    Q.  Why did she send you the article?
17    MS. LORENC:  Objection.  Calls for
18 speculation.
19 BY MR. BROOKS:
20    Q.  Did you ask her why she sent you the
21 article?
22    A.  I did not.
23    Q.  Did you discuss it with anyone else, the
24 article with anyone else at SAC Wireless?

20 (Pages 74 - 77)

Page 78

1    A.  I don't recall.
2    Q.  Don't recall.  (Inaudible) e-mails that
3  you discussed with her?
4    MS. LORENC:  Objection.  What e-mails are you
5  referring to?
6    MR. BROOKS:  E-mail that you sent me.
7    MS. LORENC:  All these -- lots of e-mails.
8    MR. BROOKS:  E-mail that you sent me.
9    MS. LORENC:  Which e-mails?
10   MR. BROOKS:  Any of them.
11  BY THE WITNESS:
12   A.  I don't recall.  But you can refresh my
13  memory.
14  BY MR. BROOKS:
15   Q.  Ain't my job.
16   A.  Okay.
17   Q.  I guess the judge -- if you want to lie
18  to the judge, I mean that's fine.  You guys lying in
19  a deposition for some reason.
20   MS. LORENC:  Objection.  You are not allowed
21  to accuse my client --
22   MR. BROOKS:  I'm not accusing your --
23   MS. LORENC:  Excuse me.
24   MR. BROOKS:  Don't yell at me.

Page 79

1    MS. LORENC:  We are on the record.
2    MR. BROOKS:  I know, so don't yell at me.
3    MS. LORENC:  Stop interrupting.
4    MR. BROOKS:  Stop yelling at me.
5    MS. LORENC:  We're going to call this
6  deposition.
7    MR. BROOKS:  Why, because you yelling at me?
8    MS. LORENC:  Because you --
9    MR. BROOKS:  That's fine.  You going to pay
10  my expenses.  You are yelling.  It's on the record.
11  It's on the record right here.
12   MS. LORENC:  When you -- hi, judge, this is
13  an improperly videotaped deposition.  For the record.
14  And if you would please refrain from interrupting me,
15  I would appreciate it.
16      You will not accuse my client of
17  lying under oath just because you don't like an
18  answer he's given.  If you have a question you would
19  like to ask him with documents that would help and
20  you want to show that to him, that's fine.  But if
21  you accuse my client of lying on the record one more
22  time we are done with this deposition.
23   MR. BROOKS:  For the record, I did not accuse
24  your client of lying on the record.

Page 80

1    MS. LORENC:  Please turn the videocamera on
2  you.
3    MR. BROOKS:  I'll turn it on you.
4      For the record, your yelling at me
5  is not going to cut it.  I am not a child.  I yell at
6  you, you take issue with it.  For the record, I was
7  merely refreshing his memory like he asked me to.
8  Okay?  Lying under oath on deposition is a felony.
9  Period.  I did not say you are lying.  I just
10  refreshed his memory.  Okay?
11      Anyway, I have a lot more I got to
12  get through.
13  BY MR. BROOKS:
14   Q.  Mr. Hamm, did you discuss the article
15  with anyone else at SAC Wireless?
16   A.  I don't recall specifically discussions.
17   Q.  Mr. Hamm, do you recall July -- I will
18  say between May 2017 and the present that I reached
19  out to you on LinkedIn?  Do you recall that?
20   A.  No, I do not.
21   Q.  Do you recall whether or not any SAC
22  hiring manager reach out to you to ask you about me?
23   A.  I do.
24   Q.  Who were they?

Page 81

1    A.  Anthony Benyola.
2    Q.  When was that?
3    A.  I don't recall a specific date.
4    Q.  What did you tell him?
5    A.  I told him that I knew you as a T1
6  coordinator, if he knew what that was.  He said I
7  knew exactly what that was.  And I said I never knew
8  you as PM or project manager.
9    Q.  What else did you tell him?
10   A.  That was the end of the conversation.
11   Q.  What did he ask you?
12   A.  He started the conversation off that
13  Rufus has used your name as reference on his resume,
14  and so I wanted to call and ask you about him.  Do
15  you know Rufus from past experience?  Something like
16  that.  And my answer was I knew you as a T1
17  coordinator.
18   Q.  That's all he said?
19   A.  And if you know what that position
20  entailed, and he said I know exactly what that
21  position is.
22   Q.  What is a T1 coordinator?
23   A.  It's a person that manages ordering T1s
24  for the cell sites and make sure they are landed and

21 (Pages 78 - 81)

Page 82

1 tested and operational, I assume. I think.
2    Q.  That's all you said, right?
3    A.  That's all I said.
4    Q.  Did you talk to any other employees?
5    MS. LORENC:  At SAC?
6 BY MR. BROOKS:
7    Q.  SAC.
8    A.  I talked to Kevin Pope.
9    Q.  What did you talk to Kevin Pope about?
10   A.  After I got off the phone with Anthony
11 Benyola I called Kevin Pope.
12   Q.  What did you tell Kevin Pope?
13   A.  That I had just -- the exact discussion
14 that I had with Anthony Benyola.
15   Q.  Who is Kevin Pope?
16   A.  He's an HR person in the company.
17   Q.  What's his responsibility -- what are his
18 responsibilities?
19   A.  He is a director of human resources.
20   Q.  And as a director of human resources,
21 what is he directing?
22   A.  Please re --
23   Q.  As a director of human resource, is he
24 responsible for hiring?

Page 83

1    A.  No, not to my knowledge.
2    Q.  So why did you feel that you had to talk
3 to him?
4    A.  He's my -- my protege. He's my HR
5 director.
6    Q.  So what did you talk about?
7    A.  I told him that you had applied for a job
8 and you used my name on your resume.
9    Q.  Okay. What else?
10   A.  And that you had had some issues with
11 Bechtel.
12   Q.  What else did you tell him?
13   A.  That was pretty much it.
14   Q.  Pretty much it?
15   A.  Yep.
16   Q.  So why did you feel you had to tell him
17 that?
18   A.  Just to let him know that I had to
19 document the fact that I had the conversation with
20 Anthony Benyola.
21   Q.  Did you have any conversation on hiring
22 manager in the field?
23   A.  What was that question?
24   Q.  Did you have any kind of conversation

Page 84

1 with all the hiring managers in the field?
2    A.  I did not.
3    Q.  Did you tell Mr. Pope that you were
4 trying to give him a heads up regarding me?
5    MS. LORENC:  A heads up?
6    MR. BROOKS:  Yeah. A warning, however you
7 want to phrase it.
8 BY THE WITNESS:
9    A.  No.
10 BY MR. BROOKS:
11   Q.  You didn't say that?
12   A.  I don't recall saying that.
13   Q.  You don't recall?
14   A.  I didn't say that.
15   Q.  What was your intention?
16   A.  To document the fact that -- that you had
17 used my name as a reference on your resume.
18   Q.  And how was -- by giving Mr. Pope this
19 information, what was your expectation?
20   A.  I don't know.
21   Q.  Were you saying, Mr. Pope, don't hire
22 this guy?
23   A.  I did not say that.
24   Q.  Were you implying?

Page 85

1    A.  No, I did not.
2    Q.  You tell me why you did it.
3    MS. LORENC:  Objection. Asked and answered.
4    MR. BROOKS:  No. I would like to know. It
5 has some bearing on this case.
6    MS. LORENC:  And he answered.
7    MR. BROOKS:  No, he hasn't.
8 BY THE WITNESS:
9    A.  You used my name on your resume without
10 my permission.
11 BY MR. BROOKS:
12   Q.  And that's all you said?
13   A.  I don't recall saying that specifically
14 to Mr. Pope, but --
15   Q.  Did you say something like this guy filed
16 lawsuits against companies or something related to
17 that?
18   A.  I don't recall.
19   Q.  He never wins but he filed lawsuits?
20   A.  I don't recall ever saying.
21   Q.  You never talked about lawsuits to
22 Mr. Pope?
23   A.  Not particularly, no.
24   Q.  You sure?

22 (Pages 82 - 85)

Page 86

1    A. I don't recall talking to any -- about
2 any of them with him.
3    Q. Do you think it was part of your
4 responsibility as employee to tell him that, to go to
5 him and say --
6    A. If I see -- probably if I see an issue.
7    Q. What?
8    A. An issue.
9    Q. So you consider Rufus Brooks had been an
10 issue?
11    A. No, I didn't say that.
12    Q. You just implied.
13    MS. LORENC: Mr. Brooks --
14    MR. BROOKS: Well, I want to know why he went
15 to Mr. Pope.
16    MS. LORENC: And he's told you that numerous
17 times.
18 BY MR. BROOKS:
19    Q. Okay. Well tell me again.
20    A. Because you used my name on your resume
21 and you are applying for the PM job.
22    Q. Do you think -- do you know how many
23 positions I applied for with --
24    A. I do not.

Page 87

1    Q. They were not shared with you by Mr. Pope
2 or anybody?
3    A. Not that I recall.
4    Q. You think I just applied for one job and
5 that was it?
6    A. I don't know.
7    Q. Did anyone discuss my application with
8 you?
9    A. No.
10    Q. For the position with --
11    A. No.
12    Q. Were you aware that I had applied for a
13 position other than the one that you talked to
14 Anthony about?
15    A. No.
16    Q. You were not?
17    A. No.
18    Q. Did you become aware after that?
19    A. No, no.
20    Q. Did Mr. Pope tell you that I had applied
21 for a position?
22    A. No, he did not.
23    Q. Did anybody else at --
24    A. I don't recall.

Page 88

1    MR. BROOKS: I would like to enter this
2 document into evidence.
3    MS. LORENC: Do you have more than one copy
4 of it?
5    MR. BROOKS: No. You have a copy machine?
6    MS. LORENC: Yeah. We are going to have to
7 take a break to get this done.
8    Before we go off the record, I would
9 like the record to reflect it's 3:54. Mr. Brooks had
10 noticed Kevin Pope's deposition for 4:00 and Mr. Pope
11 is here. What is your intention with Mr. Pope?
12    MR. BROOKS: The option it to finish with
13 Mr. Hamm and then take Mr. Pope, after Mr. Hamm, take
14 Mr. Pope and then continue with Mr. Hamm.
15    MS. LORENC: Well, Mr. Hamm is not coming
16 back tomorrow nor is Mr. Pope.
17    MR. BROOKS: Mr. Hamm is set for --
18 deposition total of seven hours.
19    MS. LORENC: Okay. Mr. Brooks, can I please
20 finish my statement?
21    MR. BROOKS: I thought you did. I'm sorry.
22    MS. LORENC: Mr. Hamm is not coming back
23 tomorrow nor is Mr. Pope. You have noticed
24 Ms. Rodriguez's deposition for tomorrow at 9:00 and

Page 89

1 yours is schedule at 1:00. The court reporter has
2 indicated that she can't stay past six today.
3    MR. BROOKS: Okay. She won't.
4    MS. LORENC: Do you intend to wrap up with
5 Mr. Hamm any time soon in which case I will ask
6 Mr. Pope to stick around or --
7    MR. BROOKS: No, I don't think so.
8    MS. LORENC: So you have two more hours with
9 Mr. Hamm?
10    MR. BROOKS: I don't know. I can't recall.
11    MS. LORENC: Mr. Brooks, you have two hours
12 left for the court reporter's time.
13    MR. BROOKS: And I have all the questions I
14 have to ask.
15    MS. LORENC: I am trying to
16 understand how you want to proceed with Mr. Pope.
17    MR. BROOKS: I just gave you my option.
18    MS. LORENC: Do you think you will be done --
19    MR. BROOKS: Asked and answered.
20    MS. LORENC: Mr. Brooks, allow me to speak so
21 the record can be cleanly readable. Do you intend to
22 proceed with Mr. Pope today whose deposition you
23 noticed for 4 o'clock?
24    MR. BROOKS: I gave you my option.

23 (Pages 86 - 89)

Veritext Legal Solutions

**Page 90**

1 MS. LORENC: Okay. We have two hours. So I
2 will ask Mr. Pope to sit around, but that's it. He
3 is not coming back tomorrow nor is Mr. Hamm. You
4 were an hour and a half late. That was not our
5 fault.
6 MR. BROOKS: And Mr. Hamm was four minutes
7 late.
8 MS. LORENC: No, Mr. Hamm was here at 11:35.
9 MR. BROOKS: Mr. Hamm was late before we
10 started after I got here.
11 MS. LORENC: You decided to grace us with
12 your presence --
13 MR. BROOKS: That's okay.
14 MS. LORENC: Mr. Brooks --
15 MR. BROOKS: There you go yelling again.
16 MS. LORENC: I am asking you to stop speaking
17 over me so that the court reporter can take --
18 (Simultaneous colloquy.)
19 MS. LORENC: No, I am not going spank you.
20 MR. BROOKS: Then stop talking to me like a
21 child then. You ain't used to no black man talking
22 to no white lady like that, are you?
23 MS. LORENC: Okay. That's it.
24 MR. BROOKS: Whatever you want.

**Page 91**

1 MS. LORENC: That is it. This deposition is
2 over.
3 MR. BROOKS: No, I got him on camera.
4 MS. LORENC: I don't care what you have.
5 MR. BROOKS: He shouldn't be reacting that
6 way. Why you reacting that way? She yelling at me.
7 MS. LORENC: I am not yelling at you.
8 MR. BROOKS: You are yelling at me.
9 MS. LORENC: I am trying to
10 how you want to proceed.
11 MR. BROOKS: I told you.
12 MS. LORENC: And I have said we will keep
13 Mr. Pope around until 6:00.
14 MR. BROOKS: Okay. I am done. Can I get a
15 copy first?
16 MS. LORENC: Yes, the white woman in the room
17 will graciously help you out, Mr. Brooks.
18 Do you two need a break? You are
19 welcome while I go do his copying for him.
20 MR. BROOKS: I will take a break, too.
21 (WHEREUPON, a recess was had.)
22 MR. BROOKS: Back on the record. This is
23 Exhibit A.
24

**Page 92**

1 (WHEREUPON, Exhibit No. A marked
2 for identification.)
3 BY MR. BROOKS:
4 Q. Okay. Mr. Hamm, "Mr. Famous, I am
5 Famous." You testified a little while ago that you
6 didn't know I had applied for other jobs with SAC
7 Wireless, right?
8 A. I didn't know. You asked me if I knew.
9 Q. Yeah, whether or not, right?
10 MS. LORENC: What was the question?
11 MR. BROOKS: I asked him did he know I had
12 applied for other positions at SAC Wireless.
13 MS. LORENC: Does he currently know or did
14 he --
15 MR. BROOKS: No, does he know.
16 MS. LORENC: Currently?
17 MR. BROOKS: No. Does he know.
18 BY THE WITNESS:
19 A. I did not know.
20 BY MR. BROOKS:
21 Q. You want her to go back and read it?
22 MS. LORENC: Does he know as we sit here
23 right now or did he know in 2017?
24 MR. BROOKS: In 2017 then.

**Page 93**

1 BY THE WITNESS:
2 A. I did not know.
3 BY MR. BROOKS:
4 Q. You knew I had applied for more than one
5 position, but you said no, you didn't know that.
6 A. I did not physically outright factually
7 know if you had applied for anymore positions than to
8 Anthony Benyola.
9 Q. I asked you that question.
10 A. Right. I did not know.
11 Q. Then no, right?
12 A. Factually.
13 Q. Right. Read where it says "I am famous,"
14 the e-mail that you sent to Kevin Pope.
15 A. I've got it.
16 Q. Read it into the record.
17 A. "Okay, just a heads up, this story is
18 about Rufus Brooks that applied to a position in
19 Bellevue for Anthony Benyola where he used me as a
20 reference that I sent to you for guidance. You may
21 want to see how many times he has applied to us as he
22 is counting and suing. He is not winning but taking
23 up time and energy from HR and legal people."
24 Q. So what was the purpose of that e-mail?

24 (Pages 90 - 93)

Page 94

1    A.  Because you already have a track record
2  with Bechtel and Mobility.
3      Q.  So this "just a heads up," is like --
4  what's the heads up mean?
5      A.  Making him aware.
6      Q.  Right.  A warning, right?
7      MS. LORENC:  Objection.  Argumentative.
8  BY MS. LORENC:
9      Q.  Can it be interpreted as a warning?
10     MS. LORENC:  Objection.  Calls for
11  speculation.
12  BY THE WITNESS:
13     A.  Don't know.
14  BY MR. BROOKS:
15     Q.  Why did you put it on there then?
16     A.  The way I speak.  I type the way I speak.
17     Q.  The way you speak can get you in a lot of
18  trouble my friend and your company.
19     MS. LORENC:  That's not a question.  You
20  don't have to say anything to that statement.
21  BY MR. BROOKS:
22     Q.  You think it's appropriate to send that
23  kind of e-mail to an HR person?
24     A.  I have no opinion.

Page 95

1      Q.  I see.  That's --
2      A.  I have no reason.
3      Q.  That's the way you communicate?
4      A.  I have no opinion on it.
5      Q.  Why did you ask him -- why did you say
6  you may want to see how many times he applied?  Why
7  did you say that?
8      A.  Because you have a track record of
9  applying a lot of times to a company.  It was in the
10  article.
11     Q.  Oh, I was going to ask you how did you
12  know about my track record.
13     MS. LORENC:  Is that a question?
14     MR. BROOKS:  Yes.
15  BY MR. BROOKS:
16     Q.  How do you know?
17     A.  It was in the article.
18     Q.  What article?
19     A.  Wireless Estimator.
20     Q.  Did you help Wireless Estimator write
21  that article?
22     A.  I did not.  No, sir.
23     Q.  You know the publisher of Wireless
24  estimator?

Page 96

1      A.  I do.
2      Q.  What's his name?
3      A.  Craig Lacutis.
4      Q.  How long you been knowing him?
5      A.  A dozen years or more.
6      Q.  When is the last time you talked to him
7  about anything?
8      A.  Two years ago.  February a year ago.
9      Q.  February of what?
10     A.  Hm?
11     Q.  February what date?
12     A.  February of 2017 -- 2018.
13     Q.  2018.  What did you all talk about?
14     A.  Wireless Estimator.
15     Q.  In what way?
16     A.  Hm?
17     Q.  Article?  What did you talk about?
18     A.  We talked about his online JSA and which
19  I was a part of him help developing.  We talked about
20  his magazine and we talked about tower fatalities.
21     Q.  So you have a business relationship with
22  him?
23     A.  Um-um.
24     MS. LORENC:  You have to say that verbally.

Page 97

1      A.  No.
2  BY MR. BROOKS:
3      Q.  You have a personal relationship, though,
4  right?
5      A.  Just through Nate.
6      Q.  How far back again?
7      A.  Probably 2009.
8      Q.  So you had a personal relationship with
9  him back in --
10     A.  It's not personal.  It's business.
11     Q.  You just said it was business.
12     A.  Well, I mean it's peer.  Peer.  I'm
13  sorry.
14     Q.  Do SAC have a business relationship
15  with him.
16     A.  No.
17     Q.  Do they take advertisements out in his
18  magazine?
19     A.  Do they what?
20     Q.  Do they advertise in --
21     A.  I have no idea.
22     Q.  You have no idea?
23         Is there a chance?
24     A.  I don't know.

25 (Pages 94 - 97)

Page 98

1    MS. LORENC: Sorry, real quickly.
2    THE WITNESS: I don't know if I can.
3 BY MR. BROOKS:
4    Q.  Did you talk to Craig, the publisher of
5 Wireless Estimator during any time between -- any
6 time during 2017?
7    A.  I don't recall.
8    Q.  Don't recall? 2018?
9    A.  In February at the Nate conference.
10    Q.  You only talked to him once in the last
11 two years?
12    A.  I don't recall if that's the only time.
13    Q.  Do you read his online magazine?
14    A.  Not every article.
15    Q.  Do you comment in the magazine, an
16 article, an opinion? Do you comment? Do you write?
17    A.  Not that I'm aware of.
18    Q.  Really?
19    A.  Not that I recall.
20    Q.  Do you follow him on LinkedIn?
21    MS. LORENC: On LinkedIn?
22    MR. BROOKS: LinkedIn.
23    MS. LORENC: Yes, LinkedIn? That's what you
24 are saying?

Page 99

1    MR. BROOKS: You know what I am saying.
2    MS. LORENC: No, I don't, I wouldn't have
3 asked.
4        Do you follow Mr. Lacutis (phonetic)
5 on LinkedIn?
6    THE WITNESS: I don't know.
7 BY MR. BROOKS:
8    Q.  Do you know what LinkedIn is?
9    A.  I do.  But I don't know -- I don't know.
10 I would have to go look.
11    Q.  Do you follow other people?
12    A.  I have a few people that I follow.
13    Q.  And Craig is not one?
14    A.  I don't know.  He could be.  I don't
15 know.
16    Q.  You said you don't recall talking to
17 Craig about this article, right? Correct? At all?
18    MS. LORENC: Objection.  I don't think that
19 question has been asked.
20 BY MR. BROOKS:
21    Q.  Have you ever discussed this article in
22 Wireless Estimator with Craig, the publisher of the
23 article? Have you ever discussed it?
24    A.  I did once.

Page 100

1    Q.  When?
2    A.  I don't remember.
3    Q.  Try to remember.
4    A.  I don't recall.
5    Q.  Did you help him write it?
6    A.  No, I did not.
7    Q.  Did you know he had written it before it
8 was published?
9    A.  It was sent to me from Nichole Thomas.
10    Q.  You didn't know anything about it?
11    A.  I did not know anything about it.
12    MS. LORENC: There is no question pending.
13 He is just going to stare at you apparently.
14    MR. BROOKS: No, I was just trying to think.
15 I am just thinking.  It's beyond me that people -- my
16 mom didn't raise me that way.
17 BY MR. BROOKS:
18    Q.  Prior to now, when's the last time you
19 actually had any kind of a conversation with me
20 whatsoever?
21    A.  The last time I remember having a
22 conversation with you was when you called me from
23 that cell site where that employee was tied off to
24 the boom gate instead of the tower and he threw a

Page 101

1 jumper as you stated.
2    Q.  You remember what year?
3    A.  2006, I think.
4    Q.  2006.  Do you follow me on Facebook?
5    A.  I don't know.
6    Q.  You don't know if you follow me?
7    A.  No, I don't know if I follow you on
8 Facebook.
9    Q.  You follow me on LinkedIn?
10    A.  I don't know.
11    Q.  Do you follow me at all?
12    A.  I don't think -- don't know.
13    Q.  Do you recall -- I'm just saying the last
14 time we talked 2006.  So you know nothing about me,
15 right?  All of sudden you read, right?
16    MS. LORENC: Objection.  Form.
17 BY MR. BROOKS:
18    Q.  Okay.  Do you know anything about me
19 other than 2006 interaction?
20    A.  I do not.
21    Q.  So why did you feel that you had to make
22 the statement to Mr. Pope that you made?
23        Why do you feel that you had to send
24 that e-mail when you didn't know anything about me

26 (Pages 98 - 101)

Page 102

1 and you hadn't see me in 15 years? Why you feel that
2 you --
3    A.  I don't recall.
4    Q.  Other than the people that you work with
5 at SAC Wireless -- other than the people that you
6 worked with at SAC Wireless, have you had any
7 conversation with anybody about me since 2006?
8    A.  In what capacity?
9    Q.  In any way.
10    A.  Other than my wife.  I talked to my wife
11 but that's --
12    Q.  What do you talk to your wife about me?
13    A.  That I had a deposition.  That's it.
14    Q.  Other than that you didn't talk to
15 anybody?
16    A.  Not that I'm aware of or not that I
17 recall.
18    Q.  Well, you took it upon yourself to say he
19 has a history or whatever you said.  In other words,
20 this guy is not fit to work for SAC Wireless.
21    MS. LORENC:  Objection.  Misstates Exhibit A
22 and his prior testimony.
23 BY MR. BROOKS:
24    Q.  That's what you implied, isn't it?

Page 103

1    MS. LORENC:  Objection.  Asked and answered.
2 BY MR. BROOKS:
3    Q.  Isn't it?  You still have to answer.
4    A.  You got to ask the question.
5    Q.  I say --
6    A.  Ask a specific question, I will answer it
7 specifically.
8    Q.  Why do you feel that you had to interfere
9 with my right to gain employment with SAC Wireless?
10    A.  I don't think that I did.
11    Q.  You don't?
12    A.  I don't recall.
13    Q.  It's okay.  I'll move -- anything else
14 you want to tell me?
15    A.  No.
16    MR. BROOKS:  Let me make sure I don't miss
17 anything.
18 BY MR. BROOKS:
19    Q.  Did you read the article from Wireless
20 Estimator?
21    A.  I did.
22    Q.  How many times did you read it?
23    A.  I don't recall.
24    Q.  One time?

Page 104

1    A.  I don't recall.
2    Q.  I think he has a memory problem.
3    THE COURT REPORTER:  I'm sorry, I'm not
4 understanding you.
5    MS. LORENC:  He said he does think he has a
6 memory problem if he was SAC Wireless.
7    MR. BROOKS:  I would have him (inaudible).
8    MS. LORENC:  He would have him get a
9 physical.
10 BY MR. BROOKS:
11    Q.  What do you think about the article?  Is
12 it correct?
13    A.  I didn't do the research on it, so I
14 don't know.
15    Q.  But you used that to tell Kevin Pope all
16 about me.
17    MS. LORENC:  Objection.
18 BY MR. BROOKS:
19    Q.  Did you?
20    MS. LORENC:  Misstates his testimony.
21 BY MR. BROOKS:
22    Q.  No, you said -- he say I told him about
23 the article, right?
24    A.  Finish the question.

Page 105

1    Q.  And you said based on the article -- you
2 didn't say -- well, you make a little more of a
3 detail, but you pretty much say based on this article
4 this is Rufus Brooks, right?  Based on that article?
5 Did you not imply that, that you didn't state it
6 directly, right?
7    A.  No.
8    MR. BROOKS:  The record speaks for itself.
9 So I am not going to --
10 BY MR. BROOKS:
11    Q.  In your opinion, is this article correct?
12    A.  Based on what I know.
13    Q.  Based on what you know.
14    A.  Based on --
15    Q.  Okay.  What part --
16    MS. LORENC:  Hold on, you have asked a
17 question.  He needs to answer it.
18    MR. BROOKS:  I'm sorry.
19 BY THE WITNESS:
20    A.  Based on what I know.
21 BY MR. BROOKS:
22    Q.  What do you know?
23    A.  From Bechtel.
24    Q.  You said you don't recall.

27 (Pages 102 - 105)

Veritext Legal Solutions

Page 106

1    MS. LORENC: Excuse me. He gets to answer
2 the question.
3    MR. BROOKS: I'm sorry, I thought he was
4 done. Go ahead.
5    MS. LORENC: Based on what you know, is it a
6 correct -- in your opinion, is it a correct article I
7 believe was the question.
8 BY THE WITNESS:
9    A. Parts of it based on what I know are.
10 BY MR. BROOKS:
11    Q. What parts?
12    A. The parts regarding Bechtel.
13    Q. It was all about Bechtel. A whole lot
14 about Bechtel.
15    A. No, it was not.
16    Q. What was it about?
17    A. I think it was also Mobility.
18    Q. You want to read it again? It didn't
19 mention Mobility, but it's all about Bechtel, right?
20    A. Hm-hm.
21    Q. Right?
22    MS. LORENC: It does mention Mobility, is
23 that what you just said?
24    MR. BROOKS: It mention Mobility. He said --

Page 107

1    MS. LORENC: That's his testimony.
2 BY MR. BROOKS:
3    Q. He disagreed it was mostly about Bechtel;
4 correct?
5    A. The parts about Bechtel from my knowledge
6 were correct.
7    Q. What parts?
8    A. The parts about Bechtel that --
9    Q. What parts?
10    A. The --
11    MS. LORENC: Do you need to see the article?
12 BY THE WITNESS:
13    A. It was the parts about the employee that
14 fell to his death.
15 BY MR. BROOKS:
16    Q. What else?
17    A. Were correct.
18    Q. What else?
19    A. Two years or so after the event your
20 running with it.
21    Q. You said you didn't remember that. I
22 thought --
23    A. From the article.
24    MS. LORENC: Objection. Misstates his

Page 108

1 testimony. He's already testified that he remembers
2 you calling him.
3 BY MR. BROOKS:
4    Q. Oh, okay, so that part.
5    A. (Nodding.)
6    Q. What other part of it?
7    A. The part about the fatality. I told him
8 Wireless Estimator was a recorded fatality.
9    Q. Okay. What else? That was a little
10 small piece of it. I think maybe two paragraphs.
11    Anything else?
12    A. Not at this time.
13    Q. So you don't think two paragraphs out of
14 four-page article that you think was true, right? Is
15 that what you are saying?
16    MS. LORENC: No, Mr. Brooks. You're
17 misinterpreting what he said.
18    MR. BROOKS: Why don't he tell me what he
19 said?
20    MS. LORENC: He hasn't committed it to
21 memory. So if you want to show him the article and
22 allow him to --
23    MR. BROOKS: If he can read this, God bless
24 him. I can't -- he can't recall. I can't -- I can't

Page 109

1 recall.
2 BY MR. BROOKS:
3    Q. Do you have this article about Wireless
4 Estimator? You have copies of it?
5    A. No.
6    Q. You never seen a copy of it?
7    MS. LORENC: You never sent a copy of it?
8 BY MR. BROOKS:
9    Q. No, you never seen a copy?
10    A. I have seen a copy. I have seen it on
11 the internet. I have not printed it.
12    Q. Oh, really?
13    A. That I can remember. I have seen it.
14    Q. In order to say something you have to see
15 it.
16    A. I didn't say I didn't see it.
17    MS. LORENC: Mr. Brooks, he testified that he
18 saw it. He testified that he did not print it.
19 BY MR. BROOKS:
20    Q. Did you send this copy of this document
21 to Kevin Pope?
22    A. I sent a link to it.
23    Q. Oh, you sent a link to it. So when did
24 you read it? Did you read it on the internet or did

28 (Pages 106 - 109)

Page 110

1 you print it?
2    A. I read it on the internet.
3    Q. Did you keep a copy of it?
4    A. No. It's on the internet.
5    Q. So every time you want to read it you go
6 to the internet to read it?
7    A. That's a factual statement.
8    Q. I am asking you.
9    A. That's a factual statement.
10   Q. I am asking you when you want to read
11 it --
12   A. I answered it. Asked and answered.
13 That's a factual statement.
14   Q. When you want to read this article where
15 did you go to read it?
16   A. Wirelessestimator.com.
17   Q. On the internet.
18   MR. BROOKS: Let's see what else do I have
19 for Mr. Famous.
20   MS. LORENC: Objection.
21 BY MR. BROOKS:
22   Q. I'm sorry, Mr. Hamm.
23   A. I have not disrespected you.
24   Q. I am not disrespecting you. You said it

Page 111

1 right here, "I am famous."
2    MS. LORENC: Is there a question?
3    MR. BROOKS: No, he is saying he didn't
4 disrespect me. I'm telling him I'm not disrespecting
5 him. He saying I am famous. So I was saying
6 Mr. Famous. He said I am famous, like I introduced
7 myself.
8    MS. LORENC: Move on, Mr. Brooks.
9    MR. BROOKS: I am Mr. Famous. Can you be
10 Mr. Famous? I know I what I am.
11 BY MR. BROOKS:
12   Q. Okay, so another question for you.
13      What do you mean by, it's in the
14 document, it's kind of weird to say -- what do you
15 mean by this sentence: You may want to see how many
16 times he had applied to us as he is counting and
17 suing.
18      What did you mean by that?
19   A. Because you have a historical pattern of
20 that.
21   Q. And where did you find that information?
22   A. Off the Wireless Estimator.
23   Q. Oh. So you believed the Wireless
24 Estimator?

Page 112

1    A. Yes.
2    Q. You stated earlier it was all a part
3 about Bechtel and the guy falling off the tower.
4    MS. LORENC: Objection. Misstates his
5 testimony. You asked him if it was correct. That's
6 different than what his belief is.
7    MR. BROOKS: The record show about that. I
8 will get a copy of this and we will see.
9    MS. LORENC: Next question.
10 BY MR. BROOKS:
11   Q. This article say what now?
12   MS. LORENC: Objection as to form.
13 BY MR. BROOKS:
14   Q. When you paraphrased -- I'm trying to
15 figure out why he said this. When you paraphrased --
16   A. Because of what I read in the article.
17   Q. But the sentence didn't say that.
18   A. Um, okay. Your question?
19   Q. So basically what you were trying to say
20 is looking at this article, that's Mr. Brooks right
21 there, don't hire him, he is dangerous, right?
22   MS. LORENC: Objection. Misstates his
23 testimony. Misstates Exhibit A.
24   MR. BROOKS: Let him tell me why. He said he

Page 113

1 read in the article -- there's a lot of stuff in the
2 article. I am trying to --
3    MS. LORENC: Put words in his mouth.
4    MR. BROOKS: No.
5    MS. LORENC: He didn't say the word
6 dangerous.
7    MR. BROOKS: Then let him tell me.
8    MS. LORENC: I am not going to allow you to
9 put words in his mouth. If you want to ask a
10 question, ask it and he will answer it.
11   MR. BROOKS: I asked him a question.
12 BY MR. BROOKS:
13   Q. Answer the question.
14   A. What's the question?
15   Q. The question is, what were you referring
16 to in that sentence? What were you trying to convey
17 to Mr. Pope?
18   A. Just to make him aware.
19   Q. Of what?
20   A. Of the situation at hand.
21   Q. And the situation is?
22   A. That you may be applying for several
23 positions for the sole purpose of filing a suit
24 against SAC Wireless.

29 (Pages 110 - 113)

Page 114

1    Q. Not that I wouldn't qualify, right?
2    A. It had nothing to do -- I don't know if
3 you are qualified or not.
4    Q. But you knew I am going to file suit,
5 right?
6    A. That -- I felt like you would. That was
7 the established pattern.
8    Q. Okay. You should know, right, because
9 you read the article on Wireless estimate (sic) that
10 you helped wrote?
11    MS. LORENC: Objection. Misstates his
12 testimony. You specifically asked him if he helped
13 write it and he said no.
14    MR. BROOKS: I know he helped wrote it.
15    MS. LORENC: Mr. Brooks, you can believe
16 anything you want to believe. Mr. Hamm was asked a
17 question and he answered it.
18    MR. BROOKS: Okay.
19 BY MR. BROOKS:
20    Q. At the bottom of the page from Jeff Hamm.
21 Can you read that bottom part of it?
22    A. I don't know.
23    Q. You don't know if you can read it? Put
24 them glasses on.

Page 115

1    MS. LORENC: Do you mean the part from Jeff
2 to Nichole?
3    MR. BROOKS: Hm-hm.
4    MS. LORENC: Yes?
5    MR. BROOKS: Yes.
6 BY MR. BROOKS:
7    Q. The bottom of the page. It says from
8 Jeff Hamm to Nichole.
9    A. It's a long, long story, I was a legal
10 hold from '06 to when I left. Because of this issue.
11 I could not delete anything on my laptop. They're
12 probably still in a vault in San Francisco or
13 somewhere.
14    Q. So what was the long story that you refer
15 to?
16    A. The long story is that you had been suing
17 Bechtel from '06 until I know the time I left because
18 every year I would get an e-mail from corporate legal
19 that I was to remind me I was on legal hold from the
20 cases you were filing. I did not know what was in
21 the cases. I did not know anything else but you
22 were -- I was on a legal hold. But my e-mails were
23 being archived.
24    Q. Okay. You couldn't?

Page 116

1    MS. LORENC: Objection. That misstates
2 what --
3    MR. BROOKS: Well, I asked him what he meant,
4 "This is a long, long story."
5    MS. LORENC: No, you didn't ask him what he
6 meant. You want to ask him what he meant by a long,
7 long story?
8    MR. BROOKS: I asked him why he made that
9 statement to her.
10    MS. LORENC: No, I didn't ask that.
11 BY MR. BROOKS:
12    Q. Why did you make that statement to her,
13 Nichole?
14    A. Because we have a history that goes back
15 to 2001.
16    Q. Who is we?
17    A. You and I, sir.
18    Q. You stated earlier that you hadn't even
19 talked to me or seen me or discussed me since 2006.
20    MS. LORENC: Is there a question in there?
21    MR. BROOKS: No. I'm telling him. I'm
22 answering his question.
23 BY MR. BROOKS:
24    Q. So why did you make that statement?

Page 117

1    MS. LORENC: And he answered that question.
2    MR. BROOKS: No, he didn't.
3    THE WITNESS: Yes, I did. We have --
4 BY MR. BROOKS:
5    Q. So you made a statement. You said I
6 asked you did you know me, did we talk since 2006,
7 right?
8    A. We did not.
9    Q. Did you talk to me about anybody else
10 since 2006? You said no. You didn't discuss me.
11 You said only people I discussed with you was my wife
12 about had my deposition taken. Nobody else you
13 talked to.
14    A. I never held this conversation.
15    Q. You said you didn't talk to anybody about
16 me at all. Did you or not?
17    A. Not that I recall.
18    Q. Did you ever give her the long story,
19 Nichole?
20    A. No, I did not.
21    Q. Did you give anybody else a long story?
22    A. Probably.
23    Q. Who?
24    A. I don't recall.

30 (Pages 114 - 117)

**Page 118**

1    Q. Don't recall. But you just testified you
2 didn't talk to anybody about me.
3    MS. LORENC: Misstates his testimony.
4    MR. BROOKS: Okay. I am done with Mr. Hamm.
5    THE WITNESS: Okay.
6    MS. LORENC: Do you want --
7    MR. BROOKS: For now Mr. Hamm.
8    MS. LORENC: Thank you. Not for now, no.
9 You are not -- you are either concluding this
10 deposition --
11    MR. BROOKS: Oh, I am done with this
12 deposition.
13    MS. LORENC: Okay. If that's a threat to
14 him --
15    MR. BROOKS: No, I'm telling you, okay, I'm
16 done with Mr. Hamm.
17    MS. LORENC: Okay.
18    MR. BROOKS: This deposition has ended.
19    MS. LORENC: And we will reserve signature.
20      (WHEREUPON, signature was
21      reserved.)
22      (WHEREUPON, at 4:30 p.m. the
23      deposition was concluded.)
24

**Page 119**

1          CERTIFICATE
2            OF
3   CERTIFIED SHORTHAND REPORTER
4
5
6    I, ANNETTE BREWER, a Certified
7 Shorthand Reporter of the State of Illinois, CSR
8 License No. 84-4121, do hereby certify:
9    That previous to the commencement of
10 the examination of the aforesaid witness, the witness
11 was duly sworn by me to testify the whole truth
12 concerning the matters herein;
13    That the foregoing deposition
14 transcript was reported stenographically by me, was
15 thereafter reduced to typewriting under my personal
16 direction and constitutes a true and accurate record
17 of the testimony given and the proceedings had at the
18 aforesaid deposition;
19    That the said deposition was taken
20 before me at the time and place specified;
21    That I am not a relative or employee
22 or attorney or counsel for any of the parties herein,
23 nor a relative or employee of such attorney or
24 counsel for any of the parties hereto, nor am I

**Page 120**

1 interested directly or indirectly in the outcome of
2 this action.
3    IN WITNESS WHEREOF, I do hereunto
4 set my hand at Chicago, Illinois, this 27th day of
5 February, 2019.
6
7
8        *Annette Brewer*
        ——————————————————
        ANNETTE BREWER
9         CSR License No. 84-4121
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 121**

VERITEXT LEGAL SOLUTIONS
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131
305-376-8800

February 28, 2019

Jeff Hamm
c/o Susan Lorenc
Thompson Coburn LLP
55 E. Monroe St., 37th Floor
Chicago, IL, 60603-5713
slorenc@thompsoncoburn.com
RE: Brooks, Rufus Lovell -vs- SAC Wireless, LLC
Dear Ms. Lorenc:
With reference to the deposition of Jeff Hamm
taken on 2/21/19 in connection with the above-captioned
case, please be advised that the transcript of the
deposition has been completed and is awaiting
signature.
Please have your client read the transcript and complete
the errata page. Upon completion, please send the signed
errata to our office at Two South Biscayne Blvd., Ste. 2250,
Miami, FL, 33131, or email it to litsup-fla@veritext.com.

If this is not taken care of, however, within the
next 30 days, we shall conclude that the reading
and signing of the deposition has been waived and
the original, which has already been forwarded to
the ordering attorney, may be filed with the Clerk
of the Court without further notice.
Sincerely,

Production Department
Veritext Florida

```
                                              Page 122
1          ERRATA SHEET
2    RE   : Brooks, Rufus Lovell v. SAC Wireless, LLC
     DEPO OF: Jeff Hamm
3    TAKEN : 2/21/2019
4    DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5    Page #| Line #| Change       | Reason
6    ____|____|_____|_____
7    ____|____|_____|_____
8    ____|____|_____|_____
9    ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19   ____|____|_____|_____
20   ____|____|_____|_____
21   State of _____)
     County of _____)
22
     Under penalties of perjury, I declare that I have
23   read my deposition transcript, and it is true and
     correct subject to any changes in form or
24   substance entered here.

     _____
25   Date        WITNESS NAME
```

| & | 2000 | 3 | 9 |
|---|---|---|---|

| & | & 4:10 7:17 8:11 32:2 |
|---|---|

**2000** 39:18 68:23
**2001** 21:12 23:13 24:15,23 25:3 27:8 30:6 36:9 38:15,19 38:22 39:18 42:4 45:1 116:15
**2002** 38:15
**2003** 39:18 42:4 45:1
**2005** 46:17 49:15 49:19 50:18 51:22 54:17
**2006** 19:21 21:12 30:6 36:9 46:17 101:3,4,14,19 102:7 116:19 117:6 117:10
**2007** 46:17 49:15 49:19 51:22 54:17
**2008** 46:17
**2009** 97:7
**2013** 43:20,21,22
**2014** 8:5,6 9:5,6,9
**2016** 65:18 66:11 66:13,15,19 67:1 67:14,18
**2017** 65:20 68:6,18 68:23 71:23 80:18 92:23,24 96:12 98:6
**2018** 96:12,13 98:8
**2019** 1:14 120:5 121:3
**21** 1:14
**2250** 121:1,14
**24** 15:22
**25** 15:17,23
**27th** 120:4
**28** 121:3
**2:15** 1:15 4:14

**0**
**03472** 1:4
**06** 115:10,17

**1**
**1.1** 15:18
**11** 3:12 68:18,23 71:23
**11:35** 90:8
**12** 65:20
**12:00** 4:15
**13** 49:22
**14016** 2:3
**15** 4:20 18:12 102:1
**1672** 120:7
**17** 39:20
**18** 1:4 11:22 18:12 18:13 23:4
**19** 11:21
**1989** 10:12,24 11:10,13,21,24 14:21 21:3
**1990** 11:6 12:6,6,8
**1990's** 11:7
**1992** 14:21
**1993** 14:24
**1998** 12:1
**1:00** 89:1
**1:32** 4:17

**2**
**2** 38:19,23 46:21 121:2
**2/21/19** 121:10
**2/21/2019** 122:3
**20** 20:6
**200** 38:23 55:6 58:15

**3**
**3** 38:23
**30** 121:16
**305-376-8800** 121:3
**312** 2:8
**32832** 2:4
**33131** 121:2,14
**37th** 2:7 121:6
**3:54** 88:9
**3g** 23:16 27:23

**4**
**4** 89:23
**40** 3:12
**407** 2:4
**4:00** 25:11,19 88:10
**4:30** 118:22

**5**
**5** 18:12
**55** 1:15 2:7 121:6
**580-2344** 2:8

**6**
**6** 3:3 34:9
**6000** 8:22
**60603** 2:8
**60603-5713** 121:6
**65** 73:4
**69** 5:18
**6:00** 91:13

**7**
**7** 19:21
**704-8123** 2:4

**8**
**8** 8:5 9:5,9 19:21
**84-4121** 119:8 120:9
**89** 10:15

**9**
**92** 3:7
**93** 14:23
**9:00** 88:24

**a**
abilities 45:17
ability 29:21 45:21
able 29:2,4 43:14 60:4
absolutely 26:8 36:21
accident 75:8
accommodating 4:19
accurate 119:16
accuse 78:21 79:16 79:21,23
accusing 78:22
acting 2:3
action 36:15 74:11 74:17 120:2
addition 6:3
admin 22:15
administer 46:16
administrative 22:7
admit 36:24
admitted 57:11 58:18
advertise 97:20
advertisements 97:17
advice 26:5
advised 121:11
aforesaid 119:10 119:18
afternoon 4:17
ago 49:22 70:14 92:5 96:8,8

[agree - bechtel]

agree 51:6,6
ahead 12:4 14:19
  24:5 61:15 106:4
ain't 78:15 90:21
air 34:9
airport 20:21,21
allow 28:24 89:20
  108:22 113:8
allowed 28:19
  78:20
allowing 4:19
amount 18:11
analysis 35:13
annette 1:12 119:6
  120:8
answer 8:19,21
  10:20 13:6 20:13
  22:2 23:6 24:17
  27:2,13 28:11 31:8
  31:9,10,12,18
  32:20 33:1,2 34:21
  38:4 40:23 41:3,10
  41:13,14,17,20
  42:16,20 43:14,15
  44:8 46:7 55:16
  61:15 69:8,20 70:1
  70:2,4 77:12 79:18
  81:16 103:3,6
  105:17 106:1
  113:10,13
answered 19:19
  31:5,11 32:19,20
  32:24 42:14 57:19
  58:3 60:12 62:19
  64:8,15 69:21 71:3
  74:12 76:15 85:3,6
  89:19 103:1 110:12
  110:12 114:17
  117:1
answering 27:5
  71:16 116:22

anthony 81:1 82:10
  82:14 83:20 87:14
  93:8,19
anybody 87:2,23
  102:7,15 117:9,15
  117:21 118:2
anymore 37:23
  93:7
anyway 80:11
apologize 5:24,24
  6:1,1
apparently 70:2
  100:13
appeared 2:9
application 37:6
  87:7
applied 83:7 86:23
  87:4,12,20 92:6,12
  93:4,7,18,21 95:6
  111:16
apply 22:15
applying 86:21
  95:9 113:22
appreciate 79:15
appropriate 94:22
approximately
  14:13 15:17
april 9:5
archived 115:23
area 27:9 30:8 39:2
  39:3,23 46:22 47:4
  50:23 51:8
areas 46:24
argumentative
  23:5 31:4 32:10
  42:2 43:8 58:2 60:6
  63:13 69:18 94:7
arrived 4:17
artery 19:12
article 71:24 72:3
  72:10,14 73:2 75:4

75:10,11 76:6,11
  76:14 77:16,21,24
  80:14 95:10,17,18
  95:21 96:17 98:14
  98:16 99:17,21,23
  103:19 104:11,23
  105:1,3,4,11 106:6
  107:11,23 108:14
  108:21 109:3
  110:14 112:11,16
  112:20 113:1,2
  114:9
asked 13:1,4 19:19
  31:5,22 32:18,23
  42:14 43:5,13
  56:22 57:19 58:2
  59:12,14 60:12
  62:19 64:8,15 67:6
  67:9,11 74:12
  76:15 80:7 85:3
  89:19 92:8,11 93:9
  99:3,19 103:1
  105:16 110:12
  112:5 113:11
  114:12,16 116:3,8
  117:6
asking 28:17 31:7
  32:5 39:13,16,17
  40:15,21 49:8
  59:21 68:22 71:10
  90:16 110:8,10
asks 68:15
aspects 7:22
assisting 7:23
assume 17:5 63:9
  63:10,10 82:1
at&t 21:6,10,11
  23:12,16 27:23
atlanta 8:16
attached 3:8

attorney 4:7 6:10
  6:16 50:12 73:17
  119:22,23 121:17
awaiting 121:11
aware 21:3 22:11
  45:13 70:11,12
  75:5,9 76:3,7 87:12
  87:18 94:5 98:17
  102:16 113:18
awareness 23:8
  45:8

**b**

back 7:8 26:21
  37:19 41:9 69:15
  73:21 88:16,22
  90:3 91:22 92:21
  97:6,9 116:14
based 5:5 8:15 18:1
  105:1,3,4,12,13,14
  105:20 106:5,9
basically 112:19
beach 38:10,13
  39:2,23
bearing 85:5
bechtel 10:5,10,14
  11:20,22 13:11
  14:16,22,24 18:12
  18:17,20,23 19:1
  19:10,14,21,22,24
  21:1,14,18,23
  22:14,15 23:12,13
  24:15 27:9,22 28:1
  28:6,8 29:6,6 30:6
  30:7,17 32:14 36:8
  36:12,17,20 37:3
  38:1,2 40:17 41:18
  42:4,10,11,16
  43:19 44:2,3,5 45:6
  46:11,18 49:16
  50:13,19,22 51:21
  52:2 55:18 58:14

[bechtel - certified]

59:1 60:16 61:11
62:3,6 64:7 71:11
73:8 76:8 83:11
94:2 105:23 106:12
106:13,14,19 107:3
107:5,8 112:3
115:17
beer  76:21 77:5
behalf  2:9 30:16
belief  112:6
believe  18:13 106:7
114:15,16
believed  111:23
bellevue  93:19
benyola  81:1 82:11
82:14 83:20 93:8
93:19
best  69:21,23
beyond  100:15
bird  44:16
biscayne  121:1,2
121:14
bit  53:15
black  90:21
bless  108:23
blessed  64:2
blvd  121:14
board  16:9 17:3
boom  100:24
born  15:6
boss  65:15
boston  19:12 20:5
bottom  114:20,21
115:7
boulevard  121:2
break  5:20 26:12
59:20 88:7 91:18
91:20
brewer  1:12 119:6
120:8

bridge  32:9
brooks  1:3 2:3 3:3
4:3,11,11,12 5:8
6:7,14,22 8:20 10:1
10:2,23 11:19 12:7
12:15 13:2,3,9 18:6
18:21,24 19:20
20:4,16 21:16,22
22:5,10,22 23:7
24:10,11,14 25:9
25:12,15,17,21
26:1,4,10,13,16,17
28:14,18,21 29:10
29:15,22 30:1,3,4
31:6,10,13,14,21
32:11,18,21 33:1,4
35:1 36:9,13,16,19
36:22 37:2,9,12,16
37:19,24 38:7 40:2
40:10 41:8,13,16
42:3,15 43:4,6,9
44:11 46:10 47:11
49:8,9,17,20,24
50:4 51:14,20
55:19 56:7,10,13
56:18,21,24 57:1,5
57:7,10,15,22 58:4
58:6,12 59:16,18
60:15 61:6,10,12
61:18 62:22 63:4
63:14,20 64:2,5,10
64:18,22 65:2,7,9
65:11,12,13 67:13
68:8,13,15,17,21
69:11,19,23 70:5
70:21,22 71:4,12
72:6,9,13,21 73:4
73:12,13,20 74:8,9
74:14,15 75:21
76:2,13,16 77:3,15
77:19 78:6,8,10,14

78:22,24 79:2,4,7,9
79:23 80:3,13 82:6
84:6,10 85:4,7,11
86:9,13,14,18 88:1
88:5,9,12,17,19,21
89:3,7,10,11,13,17
89:19,20,24 90:6,9
90:13,14,15,20,24
91:3,5,8,11,14,17
91:20,22 92:3,11
92:15,17,20,24
93:3,18 94:14,21
95:14,15 97:2 98:3
98:22 99:1,7,20
100:14,17 101:17
102:23 103:2,16,18
104:7,10,18,21
105:4,8,10,18,21
106:3,10,24 107:2
107:15 108:3,16,18
108:23 109:2,8,17
109:19 110:18,21
111:3,8,9,11 112:7
112:10,13,20,24
113:4,7,11,12
114:14,15,18,19
115:3,5,6 116:3,8
116:11,21,23 117:2
117:4 118:4,7,11
118:15,18 121:8
122:2
brooks.rufus  2:5
build  19:4,6,24
20:23 21:1
building  19:10
built  13:20,20
19:10
business  7:22 96:21
97:10,11,14

c

c  121:5
call  5:11 48:21
55:10 61:4 74:16
79:5 81:14
called  1:9 6:3,19
48:8,10,11,14 62:7
72:1 74:10 82:11
100:22
calling  55:7 74:6
108:2
calls  48:15,22
49:12 62:24 77:17
94:10
camera  4:23 5:5
37:15,23 91:3
capacity  102:8
captioned  121:10
care  91:4 121:15
carolina  23:21 25:5
carry  34:16
case  1:4 5:16 71:10
85:5 89:5 121:11
cases  115:20,21
cause  34:6
cell  81:24 100:23
central  4:14,15
19:12
certificate  35:8
119:1
certificates  34:16
34:18 35:3
certification  16:5
16:20,21 17:7,8
certifications  16:3
16:11 17:21,23
18:5
certified  1:13 3:10
16:9 17:1,3 40:12
119:3,6

certify 41:6 119:8
chance 97:23
change 122:5
changes 122:4,23
charge 6:9
check 33:9 34:18
  35:3,17 36:1
checking 33:17
checklist 33:15
chicago 1:15 2:8
  120:4 121:6
chief 66:3
child 80:5 90:21
choose 5:19 43:1,7
  43:13
civil 1:11
claims 64:1
classroom 18:4
cleanly 89:21
clear 56:16 72:4
clerk 121:17
client 5:13 69:19
  78:21 79:16,21,24
  121:13
close 39:20
coast 23:15 24:2,19
coburn 2:6 121:5
college 15:12,16,19
  15:20,21 37:4
colleges 15:23,23
colloquy 90:18
columbia 15:21
come 13:18 41:9
coming 6:2 88:15
  88:22 90:3
commencement
  119:9
comment 29:14
  56:12 98:15,16
comments 28:24

committed 108:20
communicate 95:3
communicating
  47:21
communication
  72:23
communications
  21:6
companies 10:5
  85:16
company 14:17
  19:3 82:16 94:18
  95:9
complaint 29:23
complete 20:7
  121:13
completed 20:11
  62:10 64:6 121:11
completely 63:21
completion 121:13
compliance 33:17
compound 58:10
computer 18:1
concerning 119:12
conclude 121:16
concluded 118:23
concluding 118:9
condition 36:2
conditions 36:2,2
conduct 44:20
  57:17 58:13
conducted 58:23
  60:10
conference 98:9
confidential 73:14
connection 8:22
  121:10
consider 86:9
considered 24:2
constitutes 119:16

construction 10:14
  14:5,10 16:8,18,18
  19:3 28:2 44:1,2,3
  44:6,23 45:7,16,17
  45:19,20 46:5 47:6
  48:22,23 49:5,14
continue 17:18
  20:22 35:12 36:19
  88:14
continuous 11:22
  18:14
contractor 10:16
  10:17 33:16 38:24
  42:5 54:17 55:4
  58:14,14 60:21
  73:24 74:2,21,24
  75:6
contractors 28:8
  30:22 36:3
conversation 48:7
  48:9 81:10,12
  83:19,21,24 100:19
  100:22 102:7
  117:14
convey 113:16
cook 1:14
coordinator 81:6
  81:17,22
copies 109:4
copy 88:3,5 91:15
  109:6,7,9,10,20
  110:3 112:8
copying 91:19
corporate 8:24
  115:18
corporation 8:12
  10:11
correct 6:23 7:1,2
  27:24 33:18 34:2,4
  35:11 63:8 69:16
  72:1,2 73:1 99:17

104:12 105:11
  106:6,6 107:4,6,17
  112:5 122:23
costa 20:21
counsel 5:12,12
  119:22,24
counting 93:22
  111:16
county 1:13 122:21
couple 17:15
court 1:1 5:3,4 6:4
  9:15,18 28:23 29:1
  68:10 89:1,12
  90:17 104:3 121:18
courtroom 7:11
courts 1:12
cover 24:19 46:22
  47:4
covered 23:15
  24:19
cracker 68:13,16
craig 96:3 98:4
  99:13,17,22
create 59:22
credit 15:17
crews 32:1
croatian 20:20
csr 119:7 120:9
cst 16:18
current 17:9,9,14
currently 17:14
  20:19 92:13,16
cut 13:23 80:5
cv 1:4

d

d 3:1
dam 19:11
danger 34:7
dangerous 112:21
  113:6

date 9:4 11:8 71:22
  81:3 96:11 122:25
day 7:24 120:4
days 121:16
deal 41:18
dear 121:9
death 107:14
decided 90:11
declare 122:22
defendant 1:7 2:9
  4:8 6:10
defensive 17:16
degree 16:1 22:4,8
  22:12,16
delay 4:18,19 5:11
delete 115:11
delmar 15:20
department 121:21
depends 10:13
  46:23
depo 122:2
deposition 1:9 4:14
  5:1,2,7,21 6:8,9 7:6
  7:10 25:19 27:3
  63:24 78:19 79:6
  79:13,22 80:8
  88:10,18,24 89:22
  91:1 102:13 117:12
  118:10,12,18,23
  119:13,18,19
  121:10,11,16
  122:23
describe 7:19 30:5
  30:24 32:12
description 31:20
designated 53:19
  54:2,5
designed 14:3
detail 105:3
details 39:7,12 42:8

detroit 24:6
developing 96:19
different 20:24
  52:15 112:6
directing 82:21
direction 119:16
directly 8:23 54:19
  54:20,21 105:6
  120:1
director 4:9 7:17
  82:19,20,23 83:5
disagreed 107:3
discuss 42:10,11
  55:22,24 72:22
  76:10,17,21 77:23
  80:14 87:7 117:10
discussed 78:3
  99:21,23 116:19
  117:11
discussion 26:2
  37:17 40:24 41:1,2
  82:13
discussions 45:12
  80:16
disrespect 111:4
disrespected
  110:23
disrespecting
  110:24 111:4
district 1:1,1,12
diversified 19:2
division 1:2 10:6
divulging 40:16
document 3:7
  50:13 57:7,11
  60:23 61:24 71:2
  72:12 83:19 84:16
  88:2 109:20 111:14
documentation
  36:4 62:4,5

documenting 38:18
documents 50:9
  79:19
doing 5:22 28:1
dollars 19:15
domain 73:9,10
dozen 96:5
draw 14:8
drawing 14:10
drawings 13:18,24
  14:2,5
drive 2:3 8:22
driving 17:16
duly 4:1 6:19
  119:11
duties 30:5,7,14,18
  31:15 33:5

**e**

e 1:15 3:1 61:23
  62:17,21 71:23
  76:18 77:1,8 78:2,4
  78:6,7,8,9 93:14,24
  94:23 101:24
  115:18,22 121:6
earlier 69:14 112:2
  116:18
east 2:7 23:15,15
  23:18 24:2,19,20
eastern 1:2
ed 52:3 58:20
eeo 29:23
effort 37:6
eight 12:9,11 25:12
  25:14,15
either 118:9
electrical 13:14,16
  14:2
electrician 11:2,3
  13:1
email 121:14

employed 7:13
  11:3 36:11
employee 10:16,17
  18:7,9,15,17,18,20
  18:23 49:16,17
  52:2 53:6 76:8 86:4
  100:23 107:13
  119:21,23
employees 7:23
  82:4
employment 21:13
  29:6 37:6 103:9
ended 118:18
energy 93:23
enforce 59:3,7,24
  60:4
enforced 59:14
enforcing 45:21
  62:6
engineer 13:15
  21:24
engineering 13:19
  14:3 19:3 22:4
engineers 14:3
ensure 64:24
entailed 81:20
enter 88:1 122:4
entered 122:24
entire 55:15
environment 59:23
environmental
  4:10 7:17,21 8:10
  27:17,20 30:10,15
  30:19,21 31:1 32:2
  33:10 35:20 36:1
  54:8
equipment 34:12
  55:5
errata 121:13,14
  122:1

**esh** 27:15,16 38:1 38:17 40:3 44:1 45:5 46:21,21 63:5 73:21
**established** 114:7
**estimate** 114:9
**estimator** 72:1 76:11 95:19,20,24 96:14 98:5 99:22 103:20 108:8 109:4 111:22,24
**event** 39:13 107:19
**evidence** 88:2
**exact** 71:22 82:13
**exactly** 53:12 81:7 81:20
**examination** 1:10 3:3 6:21 119:10
**examined** 6:20
**excuse** 28:17 56:11 68:14 78:23 106:1
**executed** 13:20
**exhibit** 3:6,7,8 91:23 92:1 102:21 112:23
**exhibits** 3:5
**expectation** 33:3 84:19
**expenses** 79:10
**experience** 81:15
**explanation** 4:18

**f**

**facebook** 101:4,8
**fact** 37:22 83:19 84:16
**factual** 110:7,9,13
**factually** 93:6,12
**fagel** 2:6
**failure** 34:12
**fall** 33:13 44:16 75:13,14,22

**falling** 112:3
**familiar** 21:13
**family** 19:2
**famous** 56:1 92:4,5 93:13 110:19 111:1 111:5,6,6,9,10
**far** 5:4 28:13 59:8 60:14 70:9 97:6
**fashion** 34:4
**fatalities** 39:20 96:20
**fatality** 39:5 75:7 75:12 76:5 108:7,8
**fault** 90:5
**febrary** 121:3
**february** 1:14 96:8 96:9,11,12 98:9 120:5
**federal** 1:11
**feedback** 45:6,10 45:16,19 46:5
**feel** 6:6 26:18,23,24 27:5 63:16 64:2 83:2,16 101:21,23 102:1 103:8
**feeling** 26:22
**feet** 34:9
**fell** 19:13 107:14
**felony** 80:8
**felt** 114:6
**field** 13:14,16,20 61:8 66:3 83:22 84:1
**fifth** 14:8
**figure** 112:15
**file** 114:4
**filed** 63:22 65:5,10 85:15,19 121:17
**filing** 113:23 115:20

**fill** 62:18 63:19
**filled** 64:6
**find** 37:5 51:5 70:22 71:7 72:18 111:21
**fine** 26:23,24 57:14 71:17,18 78:18 79:9,20
**finish** 29:1 88:12 88:20 104:24
**first** 6:19 10:14,24 16:16 59:19 75:15 76:3 91:15
**fit** 102:20
**five** 9:3 16:24
**fl** 121:14
**fla** 121:14
**floor** 2:7 121:6
**florida** 2:4 23:24 38:2,8,19 39:2,3,23 41:10 47:2 50:23 50:23 51:22 121:2 121:21
**follow** 98:20 99:4 99:11,12 101:4,6,7 101:9,11
**follows** 6:20
**foot** 55:6 58:15
**footwear** 35:16
**foregoing** 119:13
**foreman** 11:2,4
**forgot** 26:20
**form** 10:19 18:19 20:2 21:15 22:1,9 22:18 27:12 31:17 34:20 36:7 38:3 44:7 46:6 47:8 51:17 61:5,14 62:3 62:4,6,7,10 63:16 63:20 64:6 69:7 75:17 76:1 77:2,11

101:16 112:12 122:23
**forward** 71:14
**forwarded** 121:17
**found** 72:17
**four** 90:6 108:14
**frame** 38:12,22 40:4 50:18 51:23 52:16 54:17 63:6 66:9
**frames** 52:15
**francisco** 115:12
**free** 6:6
**fresh** 5:20
**friend** 94:18
**further** 121:18

**g**

**gain** 37:6 103:9
**gate** 100:24
**georgia** 8:16 23:24
**gesturing** 57:7
**getting** 40:18
**give** 9:19 17:15 26:4 31:24 33:24 39:7,12 45:16,19 46:5 52:20 71:9 84:4 117:18,21
**given** 5:14 6:10 63:21 79:18 119:17
**giving** 45:10 84:18
**glass** 76:21 77:5
**glasses** 35:15 114:24
**go** 12:4 14:19 15:8 15:12,14,19 24:5 25:21 26:21 32:8,9 37:8,9,12,14,19 40:16,20 41:23 61:15 71:14 73:10 73:21 86:4 88:8 90:15 91:19 92:21

99:10 106:4 110:5
110:15
**god** 108:23
**goes** 42:13 116:14
**going** 5:14 7:23
10:12 17:2 25:7,22
25:24 28:16 29:19
31:7 34:1 35:23
37:5,10,21 41:9
42:8,20 46:15 57:1
63:23 64:23 65:3
74:14 79:5,9 80:5
88:6 90:19 95:11
100:13 105:9 113:8
114:4
**good** 26:19 70:7,8
73:5
**grace** 90:11
**graciously** 91:17
**grader** 14:8
**graduate** 15:10
**grounds** 29:21
**group** 10:5
**guess** 78:17
**guidance** 47:13,22
62:13 93:20
**guy** 5:18 19:14
73:22 84:22 85:15
102:20 112:3
**guys** 76:17 78:18

**h**

**haber** 2:6
**half** 11:23 18:13
25:20 90:4
**hamm** 1:9 3:2 4:9,9
4:15,19,24 5:20,24
6:18,23,23 7:1,13
15:2 26:22 27:8
43:12 57:8,11
80:14,17 88:13,13
88:14,15,17,22

**hamm's** 29:6
**hand** 113:20 120:4
**happened** 37:5
39:18 42:7 70:14
75:22
**hard** 35:15 71:6
**hat** 35:15
**hazard** 59:22
**head** 7:3 9:18 29:11
**headquarters** 8:17
**heads** 84:4,5 93:17
94:3,4
**health** 4:10 7:17,21
8:10 16:8,18 27:17
27:21 30:10,15,20
30:21 31:1 32:2
33:10 35:21 36:2
38:18 54:8 70:6
**hear** 9:15,22 18:16
22:13 29:12 43:11
**heard** 75:15
**heimer** 52:3
**held** 26:2 37:17
117:14
**help** 50:9 71:10,13
79:19 91:17 95:20
96:19 100:5
**helped** 114:10,12
114:14
**hemingway** 52:21
52:22
**hereto** 119:24
**hereunto** 120:3
**hey** 26:6
**hi** 79:12

**high** 15:8 37:4
**hire** 21:23 22:6
84:21 112:21
**hired** 23:4,10 28:8
**hiring** 21:14 77:9
80:22 82:24 83:21
84:1
**historical** 111:19
**history** 102:19
116:14
**hm** 31:23,23 52:23
54:23 69:12 96:10
96:16 106:20,20
115:3,3
**hogan** 68:3,5
**hold** 36:20 105:16
115:10,19,22
**home** 7:23
**hong** 20:20
**hoover** 19:11
**hour** 25:19 90:4
**hours** 4:20 15:17
15:22,23 25:13,14
25:15,16,17 88:18
89:8,11 90:1
**houston** 15:5
**hr** 82:16 83:4 93:23
94:23
**huh** 73:11
**human** 82:19,20,23
**hygiene** 17:17

**i**

**idea** 6:12 97:21,22
**identification** 92:2
**identify** 4:3 57:9
**il** 121:6
**illinois** 1:1,14,16
2:8 119:7 120:4
**imminent** 34:7
**implied** 86:12
102:24

**imply** 105:5
**implying** 84:24
**important** 5:23
16:15
**improper** 5:7
**improperly** 79:13
**inaudible** 41:4 55:5
68:13 78:2 104:7
**incident** 38:23
54:16 55:3 58:14
60:5 62:7,9,10
63:15 64:6 73:22
74:4,7 75:6,16,18
75:20
**indicated** 4:24 89:2
**indicating** 70:1
**indirectly** 120:1
**industrial** 17:17
**industry** 17:5
**information** 40:17
40:19 41:19,22
42:17 71:9 84:19
111:21
**informing** 61:23
**instructor** 17:17
**instrumentation**
13:14 14:2
**intend** 89:4,21
**intention** 84:15
88:11
**interact** 44:3,4,5
47:6 49:5,13 53:13
**interacting** 47:18
**interaction** 101:19
**interested** 120:1
**interfere** 103:8
**intergraph** 17:18
**internet** 40:20
41:23 109:11,24
110:2,4,6,17

| | | | |
|---|---|---|---|
| interpret 13:18,19 | jobs 14:19 92:6 | 74:2 75:1,2,3 79:2 | lead 37:5 |
| interpreted 94:9 | jonathan 66:1 | 81:15,19,20 83:18 | learner 17:17 |
| interrupt 29:1 | jsa 96:18 | 84:20 85:4 86:14 | leave 9:12 12:12 |
| interrupting 57:4 | jsas 44:16 | 86:22 87:6 89:10 | 13:4 43:19,23 |
| 79:3,14 | judge 5:9 42:19,21 | 92:6,8,11,13,15,17 | left 37:20 89:12 |
| introduce 57:2 | 46:16 78:17,18 | 92:19,22,23 93:2,5 | 115:10,17 |
| introduced 57:12 | 79:12 | 93:7,10 94:13 | legal 93:23 115:9 |
| 111:6 | july 11:7 65:20 | 95:12,16,23 97:24 | 115:18,19,22 121:1 |
| investigate 55:11 | 68:18,23 71:23 | 98:2 99:1,6,8,9,9 | legally 16:10 |
| 58:8 59:13,20 | 80:17 | 99:14,15 100:7,10 | license 119:8 120:9 |
| investigation 41:4 | jump 32:8 | 100:11 101:5,6,7 | licensed 5:3 |
| 42:9 55:13 57:16 | jumper 54:18 55:4 | 101:10,12,14,18,24 | lie 78:17 |
| 57:17,18 58:8,13 | 58:15 64:14,20 | 104:14 105:12,13 | life 42:5,7 |
| 58:23 59:11 60:9 | 73:23 74:22 75:7 | 105:20,22 106:5,9 | lifted 56:14,17,24 |
| 60:10 | 75:23 76:4 101:1 | 111:10 114:2,8,14 | line 3:11 51:13 |
| involved 75:7 76:5 | june 11:7 | 114:22,23 115:17 | 55:15 122:5 |
| 77:9 | **k** | 115:20,21 117:6 | link 109:22,23 |
| irrelevant 63:22 | keep 31:7 34:1 | knowing 96:4 | linkedin 80:19 |
| irving 8:22,23 | 91:12 110:3 | knowledge 77:14 | 98:20,21,22,23 |
| issue 62:1 80:6 86:6 | kevin 25:18 82:8,9 | 83:1 107:5 | 99:5,8 101:9 |
| 86:8,10 115:10 | 82:11,12,15 88:10 | kong 20:21 | listening 35:23 |
| issues 38:18 44:17 | 93:14 104:15 | **l** | litigation 36:18,21 |
| 83:10 | 109:21 | l&g 20:18 | 37:1 40:14 73:6,7 |
| **j** | killed 19:14 38:24 | lack 29:7 | litsup 121:14 |
| jacob 4:5 | kind 16:11 21:2 | lacutis 96:3 99:4 | little 5:22 92:5 |
| jeff 1:9 3:2 4:9,15 | 35:11 60:23 62:3 | lady 90:22 | 105:2 108:9 |
| 6:18,23 7:1 29:16 | 83:24 94:23 100:19 | laid 12:18 | llc 1:6 121:8 122:2 |
| 31:15 114:20 115:1 | 111:14 | landed 81:24 | llp 121:5 |
| 115:8 121:4,10 | knew 81:5,6,7,7,16 | laptop 115:11 | located 8:17 |
| 122:2 | 92:8 93:4 114:4 | larger 34:4 | location 23:14 |
| jempson 53:7 | know 5:4 6:2,4 | late 5:14,24 6:5 | 44:18 50:20,20,22 |
| jersey 23:24 24:3 | 11:11,14 19:16,16 | 26:14 90:4,7,9 | 51:6 |
| job 10:18 13:17 | 20:8,9,15 21:21 | latitude 63:21 | locations 51:1 |
| 14:15 31:16,20 | 23:3 26:5 28:11 | lativa 20:18 | long 8:1 9:2 11:3 |
| 32:12,13 33:6,8 | 32:3 34:14 36:22 | lawsuit 29:8 36:16 | 11:16,20 14:11 |
| 35:13 38:18,23 | 38:12 49:12,13 | 42:13 63:22 65:6,9 | 20:6 32:22 50:19 |
| 39:5 42:4 44:22 | 50:16 51:11 53:22 | lawsuits 85:16,19 | 66:4 96:4 115:9,9 |
| 52:5 53:3 59:21,24 | 56:7 59:8 60:14 | 85:21 | 115:14,16 116:4,4 |
| 63:8,10,11,12,16 | 63:3 66:16,17,18 | lawyer 5:10 26:6 | 116:6,7 117:18,21 |
| 63:17 78:15 83:7 | 69:1,8 70:9,19 71:5 | 71:4 | look 33:12 39:19 |
| 86:21 87:4 | 71:20 72:20 73:8 | | 40:16,20 99:10 |

**looking** 33:9,18
  71:19 73:5 112:20
**lorenc** 2:7 4:7,7,12
  6:6,12 8:18 9:19
  10:19 11:18 12:2
  12:13,24 13:6 18:2
  18:19 19:19 20:2
  20:12 21:15,19
  22:1,9,18 23:5 24:9
  24:13,16 25:6,11
  25:14,16,18,23
  26:8,11,15 27:12
  28:10,16,19,22
  29:13,19,24 30:2
  31:4,9,11,17 32:10
  32:18,22 33:2
  34:20 36:7,11,14
  36:17,20,24 37:10
  38:3 40:1,9 41:6,11
  42:2,12 43:3,5,8
  44:7 46:6 47:8 49:7
  49:15,19,21 50:2
  51:12,17 55:14
  56:5,8,11,14,19,23
  57:3,6,13,19 58:2,5
  58:10 59:14 60:6
  60:12 61:5,9,11,13
  62:19,24 63:13,18
  64:3,8,15,24 65:5,8
  65:11 67:11 68:11
  68:14,20 69:7,18
  69:21 70:1,21 71:1
  72:4,8,11,19 73:12
  73:18 74:5,12
  75:17 76:1,12,15
  77:2,11,17 78:4,7,9
  78:20,23 79:1,3,5,8
  79:12 80:1 82:5
  84:5 85:3,6 86:13
  86:16 88:3,6,15,19
  88:22 89:4,8,11,15

  89:18,20 90:1,8,11
  90:14,16,19,23
  91:1,4,7,9,12,16
  92:10,13,16,22
  94:7,8,10,19 95:13
  96:24 98:1,21,23
  99:2,18 100:12
  101:16 102:21
  103:1 104:5,8,17
  104:20 105:16
  106:1,5,22 107:1
  107:11,24 108:16
  108:20 109:7,17
  110:20 111:2,8
  112:4,9,12,22
  113:3,5,8 114:11
  114:15 115:1,4
  116:1,5,10,20
  117:1 118:3,6,8,13
  118:17,19 121:5,9
**lose** 42:5,7
**lot** 14:19 49:13
  63:21 80:11 94:17
  95:9 106:13 113:1
**lots** 78:7
**lovell** 1:3 2:3 121:8
  122:2
**lying** 78:18 79:17
  79:21,24 80:8,9

      **m**

**machine** 88:5
**macon** 51:3,7,16,22
**magazine** 71:24
  96:20 97:18 98:13
  98:15
**mail** 61:23 62:17
  71:23 76:18 77:1,8
  78:6,8 93:14,24
  94:23 101:24
  115:18

**mails** 62:21 78:2,4
  78:7,9 115:22
**making** 29:3 94:5
**man** 73:5 90:21
**manage** 7:21
**managed** 30:24
  31:1
**management** 28:7
  38:1
**manager** 8:10
  30:11 38:17 40:3
  44:1,23 45:6,7,13
  45:16,16,17,20,20
  46:21,21 49:5,14
  51:15,21 52:9 53:1
  54:3,6 63:5 65:14
  65:20,22,24 66:4,6
  66:11,13,19 67:2,3
  67:22 68:6,19,23
  69:4 73:22 80:22
  81:8 83:22
**managers** 44:3,6
  45:20 46:5 47:7
  48:22,23 52:10,13
  53:2,4 66:15 67:9
  67:12,14,19 69:15
  84:1
**manages** 81:23
**managing** 27:20
  30:19 33:23
**manner** 5:7
**marked** 92:1
**market** 49:18 50:20
  51:15,21 52:9,10
  52:13 53:1,2,4,20
  54:7,8
**massachusetts** 24:1
**matter** 72:7
**matters** 119:12
**mckinnley** 66:1

**mean** 5:13 13:23,24
  14:1 34:8 35:22
  48:11 61:24 65:17
  78:18 94:4 97:12
  111:13,15,18 115:1
**means** 5:2
**meant** 116:3,6,6
**meet** 33:17
**memo** 61:2,3
**memory** 50:10 58:1
  70:10,20 78:13
  80:7,10 104:2,6
  108:21
**memos** 61:7
**mention** 106:19,22
  106:24
**mentioned** 16:16
**merely** 80:7
**miami** 38:8 39:3,23
  121:2,14
**michigan** 24:6
**micro** 17:18
**mid** 11:5,5,7 12:6
**migratory** 44:16
**mike** 68:3,5
**million** 19:14
**minimum** 16:24
**minute** 25:21
**minutes** 4:20 90:6
**misinterpreting**
  108:17
**mississippi** 23:16
  23:18 24:20
**misstates** 12:2,13
  12:24 42:12 49:7
  60:7 63:18 74:5
  102:21 104:20
  107:24 112:4,22,23
  114:11 116:1 118:3
**mobility** 73:8 94:2
  106:17,19,22,24

mom  100:16
monroe  1:15 2:7
  121:6
month  11:11,14
months  9:3 12:9,11
mops  44:16
morning  5:18
motorway  20:20,20
mouth  113:3,9
move  29:4 43:3,4
  63:24 71:14 103:13
  111:8
multiple  45:4 64:9
myrtlewood  2:3

**n**

n  3:1
name  16:16 19:9
  20:17 52:20 64:19
  66:21,21 67:10
  75:1,2,3 81:13 83:8
  84:17 85:9 86:20
  96:2 122:25
named  52:2 53:6
nate  97:5 98:9
nation  39:20
national  17:5,8
  69:5
nature  44:17
need  5:19 6:10 19:5
  61:24 71:14 91:18
  107:11
needed  44:13
needs  105:17
never  45:12 81:7
  85:19,21 109:6,7,9
  117:14
new  23:24,24 24:2
  24:3
nichole  66:22 68:3
  68:18,22 69:1
  71:23 72:5,6,10,14

  72:19,22 76:10
  77:9 100:9 115:2,8
  116:13 117:19
night  70:14
nine  59:24
nodded  9:18
nodding  15:1 28:5
  48:20 108:5
nokia  8:8,9,12,13
  8:14,17 9:2,4,13,23
  10:3
non  17:4 22:7
north  23:21
northern  1:1
nos  3:6
note  4:24
noted  5:9
notes  77:14
notice  1:10 5:1,13
  6:11 121:18
noticed  4:15,20
  88:10,23 89:23
number  49:12
numerous  74:13
  86:16

**o**

o  121:5
o'clock  5:18 25:19
  89:23
oath  7:11 58:17
  79:17 80:8
object  5:6 29:4,17
  29:19,21
objecting  29:20
objection  5:22 8:18
  10:19 12:2,13,24
  18:19 19:19 20:2
  20:12 21:15,19
  22:1,9,18 23:5 24:9
  24:13,16 25:6
  27:12 28:10,17,20

  29:3,13,16 31:4,17
  34:20 36:7 38:3
  40:1,9 42:2,12 43:8
  44:7 46:6 47:8 49:7
  51:12,17 55:14
  57:19 58:2 60:6,12
  61:5,13 62:19,24
  63:13,18 64:15
  69:7,18 72:19 74:5
  74:12 75:17 76:1
  76:12,15 77:2,11
  77:17 78:4,20 85:3
  94:7,10 99:18
  101:16 102:21
  103:1 104:17
  107:24 110:20
  112:4,12,22 114:11
  116:1
objective  32:10
occasionally  61:8
occasions  45:4
occurred  55:8
offer  76:20,23 77:2
  77:7
offered  18:7 77:1,4
offering  47:22
office  5:12 8:24
  13:19 14:4 50:19
  50:23 51:16,22
  52:11,14 121:14
officer  66:3
oh  13:10 19:18
  53:21 56:1,2 57:5
  70:23 73:10 95:11
  108:4 109:12,23
  111:23 118:11
ohio  24:6
okay  5:23 6:5,15,17
  7:3 12:8,11 24:5
  25:22 26:18 29:15
  29:23 31:13 32:4

  36:23,24 37:16
  43:17 45:15 48:13
  50:14 52:22 53:21
  53:21 55:3,9 56:13
  57:17 65:7,12,17
  67:3 71:11,11,15
  71:16,21 73:23
  78:16 80:8,10 83:9
  86:19 88:19 89:3
  90:1,13,23 91:14
  92:4 93:17 101:18
  103:13 105:15
  108:4,9 111:12
  112:18 114:8,18
  115:24 118:4,5,13
  118:15,17
old  5:18,19 73:4
older  65:3
once  48:1,2 98:10
  99:24
ones  21:9
online  17:20,23,24
  18:1,2 71:24 96:18
  98:13
onsite  34:19 35:12
open  40:24 41:1,2
operational  82:1
operator  17:19
opinion  94:24 95:4
  98:16 105:11 106:6
opposition  5:8
option  33:20,21
  88:12 89:17,24
order  74:19 109:14
ordered  42:11
ordering  81:23
  121:17
organization  17:4
  19:1
original  121:17

originally 15:3
orlando 2:4 50:23
  51:8,16 53:1
osha 16:12
outcome 59:10,12
  120:1
outreach 16:12
outright 93:6
owned 19:2

**p**
p.m. 1:15 4:14,15
  118:22
page 3:1,6,11
  108:14 114:20
  115:7 121:13 122:5
paid 18:9
palm 38:10,13 39:2
  39:23
paper 56:14,24
paragraphs 108:10
  108:13
paraphrased
  112:14,15
parrot 68:8,11
part 9:14 14:6
  22:16 45:5 46:1
  47:2 59:21,24 62:5
  63:8,11 71:8 86:3
  96:19 105:15 108:4
  108:6,7 112:2
  114:21 115:1
particular 19:24
  20:3 49:18 60:5
  62:10 63:15
particularly 85:23
parties 119:22,24
parts 106:9,11,12
  107:5,7,8,9,13
party 4:6 36:14,16
  36:17,21,23 37:1
  65:7

passing 16:22
patient 5:21,23
pattern 111:19
  114:7
paul 52:21,22
pay 79:9
peer 97:12,12
penalties 122:22
pending 100:12
pennsylvania 24:1
people 21:14 30:22
  35:23 59:21,23
  93:23 99:11,12
  100:15 102:4,5
  117:11
performed 30:16
performing 8:1
period 11:17,21
  12:8,23 39:3 47:19
  66:7,8,8 67:1,4
  80:9
perjury 122:22
permission 85:10
person 22:14 26:5
  34:9 64:13,19 68:4
  76:4 81:23 82:16
  94:23
person's 28:24
personal 5:16 23:8
  97:3,8,10 119:15
perspective 7:23
phone 55:10 82:10
phonetic 99:4
phrase 84:7
physical 28:1 104:9
physically 13:20
  93:6
pick 43:1,6,12
piece 55:5 56:14,24
  108:10

place 119:20
plaintiff 1:4 4:11
  6:8,9
plans 44:15,15,16
please 28:24 36:19
  37:11 43:3 45:18
  55:2 57:3 65:8,11
  79:14 80:1 82:22
  88:19 121:11,13,13
pm 81:8 86:21
point 57:1
pointed 56:17
pointing 56:6 73:19
politely 25:22
pope 65:17 82:8,9
  82:11,12,15 84:3
  84:18,21 85:14,22
  86:15 87:1,20
  88:10,11,13,14,16
  88:23 89:6,16,22
  90:2 91:13 93:14
  101:22 104:15
  109:21 113:17
pope's 25:18 88:10
position 7:16,20
  8:9 14:12 22:6,15
  46:20 81:19,21
  87:10,13,21 93:5
  93:18
positions 86:23
  92:12 93:7 113:23
possible 35:10
pp 33:13
ppe 35:13,14
presence 90:12
present 2:1 65:18
  80:18
preserve 5:6
pretty 83:13,14
  105:3

previous 119:9
print 109:18 110:1
printed 109:11
prior 8:6 10:3
  100:18 102:22
pro 2:3
probably 5:9 40:14
  51:5 70:20 86:6
  97:7 115:12 117:22
problem 70:13,20
  104:2,6
problems 70:10
procedure 1:11
proceed 4:20 6:6
  29:9 65:8,11 89:16
  89:22 91:10
proceedings 119:17
process 33:22
  77:10
product 55:18,21
  55:22
production 121:21
products 19:9
professionals 16:10
  17:4
profit 17:4
programming 69:5
project 10:13 19:12
  20:1,3,6,19 21:2
  28:7 44:2 46:23,24
  81:8
projects 19:7 20:17
  20:23
promoted 13:8,12
  13:13
proper 5:13 34:12
  34:12,14 35:8,15
property 59:23
proprietary 32:13
  32:15,17 40:5,6,11
  40:17 41:5,15 42:9

[proprietary - refreshed]

42:17 55:18
**prosecute** 71:11
**protection** 33:13
44:16
**protege** 83:4
**protocol** 33:22
42:18 59:1
**public** 40:15,19
41:22 73:9,10
**published** 100:8
**publisher** 95:23
98:4 99:22
**purchase** 9:14
**purchased** 9:13,23
**purpose** 29:3 93:24
113:23
**pursuant** 1:10,10
**put** 34:1 71:8 94:15
113:3,9 114:23

**q**

**qualification** 22:16
**qualifications**
21:14
**qualified** 114:3
**qualify** 114:1
**question** 3:10 9:24
13:22 18:16 22:13
24:21 26:20 28:18
31:8,9,10,11 32:19
32:24 33:1 40:11
40:23 41:3,6,10,17
41:20 42:14,19
43:5,7,11 45:18
46:15 50:21 55:1
56:22 57:13 58:3,4
58:5,7,11,11 59:15
59:17,19 64:3,5
67:7 68:20 69:20
71:3,17 79:18
83:23 92:10 93:9
94:19 95:13 99:19

100:12 103:4,6
104:24 105:17
106:2,7 111:2,12
112:9,18 113:10,11
113:13,14,15
114:17 116:20,22
117:1
**questioning** 51:13
55:15 57:8
**questions** 27:2,5
28:17 29:5 37:3,3
43:2,13,14 89:13
**quickly** 98:1
**quip** 77:6
**quit** 12:20
**quite** 53:15

**r**

**raise** 100:16
**rarely** 50:7
**rasel** 15:20
**reach** 80:22
**reached** 80:18
**reacting** 91:5,6
**read** 29:22,23,24
30:1,2,3 75:4 92:21
93:13,16 98:13
101:15 103:19,22
106:18 108:23
109:24,24 110:2,5
110:6,10,14,15
112:16 113:1 114:9
114:21,23 121:13
122:23
**readable** 89:21
**reading** 121:16
**real** 98:1
**realize** 7:9
**really** 19:18 23:1
50:18 54:20 61:21
70:18 74:3 98:18
109:12

**reason** 5:15 35:9
65:9 71:8 78:19
95:2 122:5
**reasonable** 5:17
**recall** 11:9,12,15
11:16 21:5 24:17
24:23 25:1,2 28:3,4
28:13 31:2,3,12
34:21 38:4,14,16
38:22 45:1,9,10,23
45:24 46:3,12,13
46:14 47:18,21
48:5,6,7,8,21 49:2
49:4,10,21 50:6,8
50:17,22,24 51:3,3
52:5,10,13 53:5,6
53:10,11,12 54:16
54:22,24 55:3,7,10
57:21,23,24 58:16
58:18,19,22 59:9
59:10 60:9,19,20
60:22 61:1,2,22,23
62:2,9,17,21 63:20
64:9,11,12,13,17
64:19,21,23 65:3,4
65:21 66:5,10,18
67:8,17,20,20,22
67:23,24 68:1,7,24
69:10,13,17,23
70:2,23,24 71:6,7
71:17,18,22 73:24
74:3,18,21,23
75:11,23 76:6,9
78:1,2,12 80:16,17
80:19,21 81:3
84:12,13 85:13,18
85:20 86:1 87:3,24
89:10 98:7,8,12,19
99:16 100:4 101:13
102:3,17 103:12,23
104:1 105:24

108:24 109:1
117:17,24 118:1
**recalling** 70:13
**recalls** 74:6
**receive** 48:15,22
**receiving** 48:21
74:16
**recess** 91:21
**recognized** 17:6
57:11
**recollection** 69:22
69:24 71:2
**record** 4:4,13,22
5:11,13,17 6:7
25:21,22,24 26:3
26:21 28:22 32:23
34:1 37:8,9,10,13
37:14,18,19,21,22
40:15 41:7,11 50:2
56:5,8,15,20,21,23
57:2,6,9,10 65:1
79:1,10,11,13,21
79:23,24 80:4,6
88:8,9 89:21 91:22
93:16 94:1 95:8,12
105:8 112:7 119:16
**recorded** 108:8
**reduced** 119:15
**refer** 115:14
**reference** 81:13
84:17 93:20 121:10
**referring** 6:13 36:8
78:5 113:15
**refinery** 20:18
**reflect** 4:13,22 5:11
6:7 32:23 41:11
56:9,23 57:6 88:9
**refrain** 79:14
**refresh** 71:1 78:12
**refreshed** 80:10

refreshing 80:7
refuse 40:23 41:10
refusing 41:12,20
  57:8
regard 45:17
regarding 45:20
  71:24 84:4 106:12
region 47:1,2
regional 30:11
regulations 59:2
reject 29:21
related 29:5,7 32:1
  35:20 53:18 85:16
relationship 96:21
  97:3,8,14
relative 119:21,23
released 42:9
relevance 8:18
  20:12 22:19 24:9
  24:10,13,16 25:6
  28:10 29:7,20
  51:12 55:14 61:13
remember 25:20
  39:4 51:15 52:2,5
  53:22 100:2,3,21
  101:2 107:21
  109:13
remembers 108:1
remind 115:19
repeat 45:18
rephrase 20:24
  62:4
report 8:23 65:15
reported 119:14
reporter 1:13 5:3,5
  6:4 9:15,18 28:23
  29:2 68:10 89:1
  90:17 104:3 119:3
  119:7
reporter's 89:12

representative 4:6
  53:20
requesting 62:18
  63:16
require 21:24 22:7
  22:11,16
required 32:7,8
  36:3
requirement 16:20
requirements
  21:17
research 104:13
reserve 118:19
reserved 118:21
resource 82:23
resources 82:19,20
response 9:20
responsibilities
  30:5,8 31:16 32:12
  32:13 35:2 82:18
responsibility 33:6
  45:5 46:2,4 82:17
  86:4
responsible 27:18
  27:19 30:15 33:18
  38:17 53:17 54:11
  54:14 82:24
rest 5:19,23
rested 26:24
resume 81:13 83:8
  84:17 85:9 86:20
retain 29:20
rf 17:17
rica 20:21
rigging 33:15
right 5:6 11:11
  12:1 13:11 14:5,6
  18:21 23:4,10 27:9
  28:9 30:12 35:3
  36:13 41:2 42:1
  49:14,14 51:7 60:1

60:5,11 61:3,12
  65:17 71:9 73:14
  74:1,4,8,22 75:16
  77:1 79:11 82:2
  92:7,9,23 93:10,11
  93:13 94:6,6 97:4
  99:17 101:15,15
  103:9 104:23 105:4
  105:6 106:19,21
  108:14 111:1
  112:20,21 114:1,5
  114:8 117:7
risk 7:22
river 20:19
rodriguez's 88:24
role 54:2,5
romanian 20:19
room 91:16
rufus 1:3 2:3 4:11
  73:4,9 81:13,15
  86:9 93:18 105:4
  121:8 122:2
rules 1:11 45:21
  59:1,2,2,5 62:6
running 6:5 107:20
ryan 5:12

**s**

s 3:10
sabine 20:18
sac 1:6 4:5,8,10
  7:13 8:4 9:13,23
  25:8 29:8 37:7
  42:22,23 46:4
  55:23 57:24 63:22
  64:1 65:14 67:15
  67:16 69:4 77:10
  77:24 80:15,21
  82:5,7 92:6,12
  97:14 102:5,6,20
  103:9 104:6 113:24
  121:8 122:2

safe 7:24 44:15
safety 4:10 7:18,22
  8:10,11 16:8,9,19
  17:3 27:17,20
  30:10,16,19,21
  31:1 32:2 33:10,23
  35:13,15,21 36:2
  38:18,23 40:3 45:6
  45:7,12,21,21
  53:19 54:3,6,7,8,12
  59:1,2,5,22 61:2,3
  61:7 62:6 63:5
  73:22 .
san 115:12
saw 109:18
saying 37:2 49:6
  84:12,21 85:13,20
  98:24 99:1 101:13
  108:15 111:3,5,5
says 50:12 93:13
  115:7
schedule 89:1
scheduler 6:4
school 15:8 37:4
se 2:3
second 36:20 59:16
see 29:10 56:16
  86:6,6 93:21 95:1,6
  102:1 107:11
  109:14,16 110:18
  111:15 112:8
seen 109:6,9,10,10
  109:13 116:19
select 54:9
selective 58:1
send 61:3,7,21
  77:16 94:22 101:23
  109:20 121:13
sending 61:2,23
  62:17

[sent - sworn]                                                                                          Page 136

**sent** 72:24 76:14
  77:20 78:6,8 93:14
  93:20 100:9 109:7
  109:22,23
**sentence** 111:15
  112:17 113:16
**september** 8:5 9:9
  43:20,21,22
**service** 11:22 16:22
  16:23 18:14
**services** 66:3
**set** 55:6 88:17
  120:4
**seven** 25:16,17
  88:18
**shaking** 29:10
**share** 72:15,15
**shared** 71:23 72:5
  72:6,10,11,14,17
  87:1
**sheet** 122:1
**shell** 20:18
**shorette** 4:5,5
**short** 12:23 66:7
**shorthand** 1:13
  119:3,7
**show** 50:13 55:13
  57:10,17 58:8
  72:12 79:20 108:21
  112:7
**showed** 50:9 56:15
**shut** 34:3,6 35:7
**sic** 114:9
**signature** 19:11
  118:19,20 120:7
  121:12
**signed** 121:13
**signing** 121:16
**similar** 17:7
**simultaneous** 90:18

**sincerely** 121:19
**singular** 21:6,10
**sir** 9:1,7 15:7,9,11
  16:2,4,6 21:8 23:20
  27:1 40:15 41:21
  47:5 95:22 116:17
**sit** 90:2 92:22
**site** 33:8,11,23 34:3
  34:3,6 35:5,7 38:24
  39:5 42:5 47:16,17
  55:4 100:23
**sites** 31:16 33:6
  38:18 44:22 81:24
**situation** 113:20,21
**six** 89:2
**slorenc** 2:9 121:7
**small** 108:10
**smith** 17:16
**sole** 113:23
**solutions** 121:1
**somebody** 58:21,22
**soon** 63:24 89:5
**sorry** 9:15,21 11:18
  13:23 14:20 57:5
  68:10 88:21 97:13
  98:1 104:3 105:18
  106:3 110:22
**sort** 22:8
**south** 25:5 38:8
  39:2,3,23 121:2,14
**southeast** 47:1
**southern** 15:21
**spank** 90:19
**speak** 74:21 89:20
  94:16,16,17
**speaking** 56:19
  64:13 74:23 90:16
**speaks** 105:8
**specific** 45:11,23
  47:20 51:19 52:1
  55:1 65:19 67:5,6

  81:3 103:6
**specifically** 67:17
  67:20,23 74:19
  80:16 85:13 103:7
  114:12
**specified** 119:20
**speculation** 63:1
  77:18 94:11
**sport** 15:20
**sprint** 21:6
**st** 121:6
**standing** 28:16
  29:3
**stare** 32:22 100:13
**start** 5:21 6:15 9:4
  10:10
**started** 4:13 10:15
  10:24 11:10 81:12
  90:10
**state** 1:14 17:1
  105:5 119:7 122:21
**stated** 47:24 73:23
  74:3 101:1 112:2
  116:18
**statement** 29:16
  60:18,21 88:20
  94:20 101:22 110:7
  110:9,13 116:9,12
  116:24 117:5
**states** 1:1,12 23:17
  23:18,23 24:8,12
  24:20
**station** 17:19
**stay** 89:2
**ste** 121:14
**stenographic** 5:2
**stenographically**
  119:14
**steve** 53:6 58:19
**stick** 89:6

**stop** 6:15 9:8 11:10
  57:3 79:3,4 90:16
  90:20
**stopped** 11:13,24
**story** 93:17 115:9
  115:14,16 116:4,7
  117:18,21
**street** 1:15 2:7
**stuff** 5:22 14:8
  45:22 47:22 71:19
  113:1
**subject** 122:23
**submit** 62:18
**submitted** 64:7
**substance** 122:24
**sudden** 101:15
**sued** 19:14
**suggest** 29:22,23
  30:1
**suing** 93:22 111:17
  115:16
**suit** 29:23 113:23
  114:4
**suite** 121:1
**summer** 10:14
**supervisor** 27:15
  27:16,19 30:11
**support** 47:13,22
  54:7
**supported** 32:1
**supporting** 44:15
**supposed** 30:9
**sure** 5:9 14:18 17:1
  19:11 25:7 32:16
  38:16,21 45:14,15
  50:18 71:5 74:18
  81:24 85:24 103:16
**susan** 2:7 4:7 29:22
  57:5 59:16 121:5
**sworn** 4:2 6:20
  119:11

**system** 17:16

**t**

**t1** 81:5,16,22
**t1s** 81:23
**table** 64:4
**take** 5:19,20 25:18
  26:12 28:23 51:4
  56:11 74:11,17
  76:20 77:4 80:6
  88:7,13,13 90:17
  91:20 97:17
**taken** 1:10,12 6:8
  7:6 117:12 119:19
  121:10,15 122:3
**talk** 26:6 37:21
  77:4 82:4,9 83:2,6
  96:13,17 98:4
  102:12,14 117:6,9
  117:15 118:2
**talked** 49:22 82:8
  85:21 87:13 96:6
  96:18,19,20 98:10
  101:14 102:10
  116:19 117:13
**talking** 14:18 19:15
  20:5 36:9 39:22
  40:4 45:2 49:17
  56:7 86:1 90:20,21
  99:16
**taping** 5:6
**task** 8:2
**tasks** 32:1,3,6
**taste** 64:22 65:2
**team** 61:8
**technician** 16:9,19
  17:18
**telecommunication**
  21:2 27:9 44:2
  46:24
**tell** 5:10,10 6:14
  12:22 23:23 26:11

26:13,15 32:5
33:24 35:22,22
39:13,16 42:16
43:4 44:14 49:8
71:18,19 72:15
81:4,9 82:12 83:12
83:16 84:3 85:2
86:4,19 87:20
103:14 104:15
108:18 112:24
113:7
**telling** 49:10 55:7
  111:4 116:21
  118:15
**tennessee** 24:22,24
**terminated** 9:10
  12:16 13:5
**terms** 5:15 21:14
  45:7,21 54:11 59:3
**test** 16:22
**tested** 82:1
**testified** 6:20 74:6
  74:20 92:5 108:1
  109:17,18 118:1
**testify** 119:11
**testimony** 12:3,14
  13:1 35:24 42:13
  49:7 60:7 63:19
  74:6 102:22 104:20
  107:1 108:1 112:5
  112:23 114:12
  118:3 119:17
**texas** 8:22,23 15:5
**thank** 27:7 56:4
  118:8
**thing** 68:9,12
**things** 33:12,19
  34:2,5,11 35:11,17
  44:17 45:13 59:22
  70:13,23 71:6,9

**think** 11:23 15:24
  16:24 17:9 20:11
  26:5 27:2 32:21
  36:17 42:6 58:24
  62:16,23 69:14
  73:17 75:13,14
  82:1 86:3,22 87:4
  89:7,18 94:22
  99:18 100:14 101:3
  101:12 103:10
  104:2,5,11 106:17
  108:10,13,14
**thinking** 100:15
**thomas** 66:23 68:3
  68:18,22 69:1
  71:24 76:10 77:9
  100:9
**thompson** 2:6
  121:5
**thompsoncoburn....**
  2:9 121:7
**thought** 9:21 88:21
  106:3 107:22
**threat** 118:13
**three** 15:22,23
**threw** 54:17 55:4
  58:15 60:21 64:14
  64:20 74:21 75:6
  76:4 100:24
**throwing** 73:22
**tied** 34:10 100:23
**tiger** 19:13
**time** 4:14,16,21
  10:7,8,14 12:23
  17:10 18:11,15,17
  27:22 28:24 32:7
  32:14 38:12,22
  39:3,21 40:4 41:9
  47:19 50:7,17,19
  51:22 52:15,16
  54:17 56:12 57:12

61:10,21 63:6
65:16 66:8,14 67:1
75:5,15 76:3 79:22
89:5,12 93:23 96:6
98:5,6,12 100:18
100:21 101:14
103:24 108:12
110:5 115:17
119:20
**times** 48:4 49:21
  50:3,5 64:9 74:13
  86:17 93:21 95:6,9
  103:22 111:16
**title** 10:18 27:11
  30:12,13 46:20
  52:6 53:9,23 66:2
  69:6,13
**today** 25:19 26:22
  89:2,22
**told** 81:5 83:7
  86:16 91:11 104:22
  108:7
**tomorrow** 64:23
  88:16,23,24 90:3
**top** 55:5,6 64:14,20
  73:23
**total** 18:11,14
  88:18
**tower** 54:18 58:16
  74:22 75:7 76:4
  96:20 100:24 112:3
  121:1
**track** 94:1 95:8,12
**trained** 4:23
**trainer** 16:12 17:17
**training** 34:13,15
  34:16,18 35:3,8
  44:20 45:2,4,8
  47:14,15
**transcript** 119:14
  121:11,13 122:4,23

transylvania 20:20
traveling 5:17
treat 6:15
treating 6:16
trouble 94:18
true 108:14 119:16
  122:23
truly 71:17
truth 119:11
try 100:3
trying 70:22 71:7
  84:4 89:15 91:9
  100:14 112:14,19
  113:2,16
turn 25:23 26:1
  37:22 80:1,3
twice 48:1,2
two 4:20 14:13
  15:20 48:4 49:3
  67:24 68:1 89:8,11
  90:1 91:18 96:8
  98:11 107:19
  108:10,13 121:14
type 13:17 16:5,7
  17:7,8,20,23 19:1
  36:6 75:12 94:16
typed 3:7
typewriting 119:15
typical 19:8
typically 19:6
  61:17,19,20

**u**

um 96:23,23
  112:18
understand 7:5,12
  13:2 52:12 89:16
understanding
  62:14 104:4
united 1:1,11
unknown 57:7

usa 8:17

**v**

v 1:5 122:2
varied 31:20 33:15
vault 115:12
verbal 9:19 72:23
verbally 96:24
veritext 121:1,21
veritext.com.
  121:14
video 4:23 5:2,5,6
videocamera 25:23
  80:1
videographer 5:4
videotape 5:8
videotaped 79:13
virginia 24:6,7 25:3
visit 31:16 33:6,8
  44:18,22 45:2
  47:16
visits 47:17
voluntary 43:24
vs 121:8

**w**

wait 50:13
waived 121:16
wannabe 71:5
want 5:16 11:5
  12:22 20:22 25:10
  25:18 26:6 28:18
  32:23 37:8,12,14
  37:22 41:18 43:1,6
  43:12 58:9 64:24
  70:3 71:1,5,18
  72:11 78:17 79:20
  84:7 86:14 89:16
  90:24 91:10 92:21
  93:21 95:6 103:14
  106:18 108:21
  110:5,10,14 111:15

113:9 114:16 116:6
  118:6
wanted 32:20
  81:14
wants 26:12
warning 84:6 94:6
  94:9
watch 39:24
way 20:19,24 37:21
  44:13 51:5 91:6,6
  94:16,16,17 95:3
  96:15 100:16 102:9
ways 44:12 47:12
week 70:14
weird 111:14
welcome 71:2
  91:19
went 15:15,16
  86:14
west 24:6 38:10,13
  39:2,23
whatsoever 100:20
when's 100:18
whereof 120:3
white 90:22 91:16
wife 102:10,10,12
  117:11
window 11:21
winning 93:22
wins 85:19
wire 21:10
wireless 1:6 4:5,8
  4:10 7:14 8:4 9:13
  9:23 25:8 29:8 37:7
  46:4 55:23 57:24
  63:23 64:1 65:14
  67:15,16 69:4 72:1
  76:11 77:10,24
  80:15 92:7,12
  95:19,20,23 96:14
  98:5 99:22 102:5,6

102:20 103:9,19
  104:6 108:8 109:3
  111:22,23 113:24
  114:9 121:8 122:2
wirelessestimator...
  110:16
witness 3:1 4:1
  6:19 9:17,21 10:21
  12:5 13:7 18:3,22
  20:14 21:20 22:3
  22:20 24:18 27:14
  28:12 29:12,18
  31:19 34:22 37:8
  37:14 38:5 41:7,15
  44:9 46:8 47:9
  49:23 51:18 55:17
  57:20 60:8,13
  61:16 62:20 63:2
  64:16 69:9 75:19
  77:13 78:11 84:8
  85:8 92:18 93:1
  94:12 98:2 99:6
  105:19 106:8
  107:12 117:3 118:5
  119:10,10 120:3
  122:25
woman 91:16
word 58:9 113:5
words 6:14 102:19
  113:3,9
work 8:6,12 9:2
  10:4 11:20 14:11
  19:21 21:7,11,17
  23:13,22 24:8,12
  24:21 25:3 28:9,15
  30:16 35:12 38:1,8
  44:15,15,18 54:1
  55:18,21,22 102:4
  102:20
worked 11:16 12:9
  12:22 14:21,24

|  |  |
|---|---|
| 18:12,15 19:22 | yep 83:15 |
| 21:2 23:12,13,21 | york 23:24 24:2 |
| 24:23 30:6 39:22 | yu 47:20 |
| 53:24 67:15 102:6 | |
| **workers** 33:11 | |
| **working** 10:3,15 | |
| 11:1 13:10 22:14 | |
| 27:9,23 36:8 38:19 | |
| 39:4 44:1 45:1 | |
| 46:18 61:11 67:15 | |
| **worldwide** 19:2 | |
| **wrap** 89:4 | |
| **write** 61:24 95:20 | |
| 98:16 100:5 114:13 | |
| 122:4 | |
| **written** 3:7 60:18 | |
| 60:20,23 100:7 | |
| **wrote** 114:10,14 | |

|  |
|---|
| **x** |
| **x** 3:1 |

|  |
|---|
| **y** |
| **yahoo.com** 2:5 |
| **yards** 59:24 |
| **yeah** 15:4 27:6 |
| 42:24 48:12 56:2,3 |
| 56:3 70:17,23 77:8 |
| 84:6 88:6 92:9 |
| **year** 10:22 15:20 |
| 21:11 36:8 66:6 |
| 67:18 73:4 96:8 |
| 101:2 115:18 |
| **years** 5:18 7:8 |
| 11:23 14:13 15:16 |
| 16:22,23 18:12,13 |
| 20:6 23:4 38:20 |
| 49:22 96:5,8 98:11 |
| 102:1 107:19 |
| **yell** 78:24 79:2 80:5 |
| **yelling** 79:4,7,10 |
| 80:4 90:15 91:6,7,8 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXH. A

Facebook
Twitter: @SACWLLC

This e-mail contains CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (847) 944-1628 or forward the e-mail message to us at                    and advise us that you have deleted it. Thank you.

**From:** Jeff Hamm
**Sent:** Wednesday, July 12, 2017 7:32 AM
**To:** Kevin Pope <                    >
**Subject:** FW: Wireless Estimator

I AM FAMOUS!!!!!!

Just a heads up....

This story is about Rufus Brooks that applied to a position in Bellevue for Anthony Benyola where he used me as a reference that I sent to you for guidance. You may want to see how many times he has applied to us as he is counting and suing. He is not winning but taking up time and energy from HR and legal people.

Thanks

**Jeff Hamm, CHST | Director of Environmental, Health & Safety|** O: 678-430-8626 | C: (706) 429-4310
SAC Wireless, 2160 Breckinridge Blvd, Lawrenceville, GA, 30043

SAC

This e-mail contains CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at 706-429-4310 or forward the e-mail message to us at                    and advise us that you have deleted it. Thank you.

**From:** Jeff Hamm
**Sent:** Wednesday, July 12, 2017 8:27 AM
**To:** Nichole Thomas <                    >
**Subject:** RE: Wireless Estimator

This is a long, long story. I was on a legal hold from 06 to when I left because of this issue. I could not delete anything. All my laptops are probably still in a vault in San Francisco or somewhere.

2